TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-03-00235-CV







Democracy Coalition, Stefan Wray, Risako Kurono, Matthew Korn, Kristan Barber,

Chandra Ward, Kristin Richardson, Lucinda Beringer, Sonia Santana,

Douglas Foxvog, Ann Stark, and Susana Almanza, Appellants


v.


The City of Austin, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. GN101586, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING





O P I N I O N




 This case involves a complaint by a community action group, the Democracy
Coalition, and its individual members (collectively, appellants) that the City of Austin--through its
police department, individual officers, and official policies as executed--violated their constitutional
rights to free speech and free assembly during President George W. Bush's appearance in Austin
shortly after he was elected. Appellants assert that the City violated their rights when police officers
prevented them from assembling in a traditionally recognized free-speech area to voice their protest
against the President, and when mounted officers used their horses to intimidate, physically contact,
and disrupt their protest. The trial court entered a directed verdict for the City on appellants' federal
and state constitutional claims. Because appellants failed to present evidence on one or more
elements of their federal claim, we affirm the judgment of the district court as to that claim. We
reverse the district court's judgment as to the state constitutional claim because the City was not
entitled to judgment as a matter of law, and we remand that portion of this cause for further
proceedings consistent with this opinion.


BACKGROUND


 Newly elected President George W. Bush visited Austin on April 27, 2001, to
commemorate the grand opening of the Bob Bullock State History Museum. After visiting the
museum, the President went to the nearby Governor's Mansion to have lunch with Governor Rick
Perry. Appellants had protested against the President at the museum and then proceeded toward the
mansion to continue their protest. Appellants approached the intersection of 11th and Lavaca Streets
from the northeast, intending to cross the streets and proceed to an area directly west of the mansion,
which is traditionally recognized as a spot to exercise free-speech rights in full view of the media
and officials visiting the mansion. Appellants were prevented from crossing the street by a row of
Austin Police Department (APD) officers, who were standing just off the sidewalk's curb in the
street. The secret service allegedly asked the APD, for security reasons, to keep people from
crossing the street or approaching the mansion.

 As appellants approached the intersection, Sergeant Darrell Boydston called in the
mounted-patrol unit to help contain the protestors on the northeast corner of the street. Four police
officers mounted on horses proceeded north on Lavaca Street toward appellants. The mounted
officers approached appellants, using their horses to move the protestors from the street back onto
the sidewalk toward a parking lot to allow the officers on foot to get out of the street to avoid
oncoming traffic. Appellants were periodically chanting and shouting at the police officers but at
all times were peaceful in their protest. At one point, the horse of Officer Ken Farr unexpectedly
bolted into the crowd of appellants, allegedly physically contacting some of them but harming no
one. Once Officer Farr regained control of his horse, he retook his position near the edge of the
sidewalk with the other mounted officers. Eventually the mounted unit left the scene, but police
officers on foot continued to prevent appellants from crossing the street in either direction.

 Appellants filed suit in Travis County district court, alleging that the actions of the
officers and their employer, the City, violated their federal and state constitutional rights to free
speech and assembly; they sought damages as well as injunctive and declaratory relief. Their federal
claim was filed under section 1983 of title 42 of the United States Code, which imposes liability on
a government that, under color of some official policy, "causes" an employee to violate another's
constitutional rights. Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978); see 42
U.S.C.A. § 1983 (West 2003). (1) Their state claims in equity sought to enjoin the use of similar tactics
in the future to control political speech, along with declaratory relief. (2) At the close of appellants'
evidence, the City moved for a directed verdict, contending that appellants had presented no
evidence of an official policy that was unconstitutional or of which the City had notice that was
being implemented in a way to violate citizens' constitutional rights. After hearing argument on the
City's motion, the trial court entered a directed verdict, dismissing appellants' federal and state
claims against the City. (3)


DISCUSSION


Standard of review

 A directed verdict is proper only when (1) the evidence conclusively establishes the
right of the movant to judgment or negates the right of the opponent, or (2) the evidence is
insufficient to raise a fact issue that must be established before the opponent is entitled to judgment. 
Prudential Ins. Co. of Am. v. Financial Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). In
reviewing a directed verdict, we view the evidence in the light most favorable to the party against
whom the verdict was rendered and disregard all contrary evidence and inferences. Szczepanik v.
First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); White v. Southwestern Bell Tel. Co., 651
S.W.2d 260, 262 (Tex. 1983). If there is any conflicting evidence of probative value that raises a
material fact issue on any theory of recovery, a determination of that issue is for the jury. 
Szczepanik, 883 S.W.2d at 649; White, 651 S.W.2d at 262. 

 Although the rules of civil procedure require a motion for directed verdict to state the
specific grounds supporting it, Tex. R. Civ. P. 268, the failure to specify a ground in the motion is
not fatal if there are no fact issues raised by the evidence and the prevailing party is entitled to
judgment as a matter of law. Deutsch v. Hoover, Bax & Slovacek, L.L.P., 97 S.W.3d 179, 195 (Tex.
App.--Houston [14th Dist.] 2002, no pet.) (citing Texas Employers Ins. Ass'n v. Page, 553 S.W.2d
98, 102 (Tex. 1977)). Similarly, even if the reason given by the trial court is erroneous, the granting
of a directed verdict can be affirmed if another ground exists to support it. Robbins v. Payne, 55
S.W.3d 740, 746 (Tex. App.--Amarillo 2001, pet. denied) (citing Kelly v. Diocese of Corpus
Christi, 832 S.W.2d 88, 90 (Tex. App.--Corpus Christi 1992, writ dism'd w.o.j.)).


Section 1983 liability

 The requirements for section 1983 liability were first enunciated by the United States
Supreme Court in Monell: (1) the execution of a government's policy or custom, (2) that is made
by the government's lawmakers or those whose edicts or acts may fairly be said to represent official
policy, (3) that inflicts constitutional injury. 436 U.S. at 694. (4) "Locating a 'policy' ensures that a
municipality is held liable only for those deprivations resulting from the decisions of its duly
constituted legislative body or of those officials whose acts may fairly be said to be those of the
municipality." Board of County Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997) (citing Monell,
436 U.S. at 694). The Supreme Court has "consistently refused to hold municipalities liable under
a theory of respondeat superior." Id. at 403. "The 'official policy' requirement was intended to
distinguish acts of the municipality from acts of employees of the municipality, and thereby make
clear that municipal liability is limited to action for which the municipality is actually responsible." 
Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Recovery from a municipality is limited
to acts that the municipality has officially sanctioned or ordered. Id.

 A policy can take the form of either (1) duly promulgated policy statements,
ordinances, or regulations; or (2) a widespread, persistent practice or custom of city officials or
employees. Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001) (citing Webster v. City
of Houston, 735 F.2d 838, 841 (5th Cir. 1984)). In this case, appellants have consistently conceded
that they are not alleging the existence of a custom or practice, but rather a duly promulgated policy
statement, as evidenced by the APD's written standard operating procedures and the mounted unit
trainer's written syllabus used to teach officers crowd-control procedures. In turn, the City urged
its oral motion for a directed verdict, contending that appellants had presented no evidence of the
Monell requirements to establish a policy. (5) Although we may affirm the trial court's judgment on
any theory that would support a directed verdict for the City, see Robbins, 55 S.W.3d at 746, we
begin by addressing the requirement of a duly promulgated policy.

 Appellants cite three forms of evidence in the record to support their argument that
the City had an official policy. First, the APD's written mounted-patrol standard operating
procedures state the purposes for which the mounted patrol should be used, including "[c]rowd
control--any situation requiring the control, movement, or dispersal of a large group of people in
an attempt to maintain order and peace," among other uses such as search and rescue, patrol, and
civic educational demonstrations. Second, appellants cite a written lesson plan covering crowd-management tactics devised by APD Officer Mike Carlson, who teaches mounted patrol techniques
to police officers. The lesson plan states that the goal of the course is "to acquaint the student with
passive crowd management on horseback." It defines four different types of crowds--from casual
(such as shoppers) to expressive ("group unified for common purpose directed by well-defined
leadership") to aggressive (such as a mob or riot). The lesson plan then lists four increasingly
assertive forms of mounted response:


1. Command Presence


 a. Appear professional, uniformed and well trained


2. Verbal Commands


 a. Clear, concise commands when entering or moving a crowd


 b. Allow adequate time for compliance


3. Mounted Approach


 a. Intimidation factor of horse


 1. Causes crowd to move without physical contact


 b. Slow, controlled movements allowing crowd opportunity to retreat


4. Mounted Contact


 a. Use of mount to physically push crowd in specific direction


 b. Slow, controlled movements allowing crowd opportunity to retreat.



In conjunction with this syllabus, appellants cite training videos that show mounted officers acting
in concert to move a crowd of people in a certain direction. Lastly, appellants cite testimony by APD
officers on the scene on April 27. Sergeant Dukes, commander of the mounted unit, said,
"[E]verything was done [that day] consistent and pursuant to City policy." Sergeant Hutto explained
that "everything that happened here . . . is totally consistent with official policies of the City of
Austin." They also cite Sergeant Dukes's statement that the lesson plan governed the actions he
ordered that day. Appellants urge that this evidence is sufficient to show that the City had an official
policy that meets the first Monell prong.

 Appellants' argument fails in light of the specific requirements of an official policy
for section 1983 purposes. To subject a municipality to section 1983 liability, a "policy" must either
be per se unconstitutional ("facially unconstitutional") or promulgated in deliberate indifference to
the "known or obvious consequences" that constitutional violations would result (a "facially
innocuous policy"). Piotrowski, 237 F.3d at 579-80. (6) The gravamen of appellants' complaint that
the policy is per se unconstitutional is that officers mounted on horses can never be called upon to
control crowds exercising free speech and assembly (so-called "expressive" crowds). Appellants
contend that horses can too easily be spooked to act unpredictably, potentially causing injury to
citizens, and that their use is intimidating and can chill the free exercise of speech and assembly
more so than officers on foot. Thus, they conclude, the use of horses to control political-speech
crowds is fundamentally at odds with the freedoms sought to be exercised by an expressive crowd.

 We are not persuaded that the three alleged enunciations of the City's
"policy"--mounted-patrol standard operating procedures, the training syllabus and videos, or
"admissions" that the events of April 27 were in accordance with City policy--constitute a facially
unconstitutional policy. Despite appellants' protests that horses are dangerous and unpredictable,
the use of officers mounted on horses to control crowds in general cannot be per se unconstitutional
any more than is the use of police officers on foot. The possibility that horses might be used to
control a particular type of crowd--one exercising its rights to free speech and assembly--also is
not per se unconstitutional. Indeed, the standard operating procedures note that crowd control is to
be used in situations where order and peace must be maintained. The "policy" alleged does not call
for the use of mounted officers to quell free speech and assembly under any circumstances. The
"policy" merely allows for mounted officers to be one means the APD may use when it reasonably
determines that crowd-control measures are necessary. The right to free speech does not guarantee
the right to communicate one's views at all times and places or in any manner that may be desired. 
See Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). It
is well established that a government may establish reasonable and content-neutral time, place, and
manner restrictions on the rights to free speech and assembly. See, e.g., Clark v. Community for
Creative Non-Violence, 468 U.S. 288, 293 (1984).

 Appellants insist that the APD's actions on April 27, 2001, were content-based
because some pro-Bush supporters were allowed to access the free-speech area that appellants were
prevented from reaching. But nothing in the mounted-unit operating procedures intimates that horses
are to be used in such a fashion. We reject appellants' contention that the City's policy of using
mounted police officers to control crowds, even those exercising political speech, is facially
unconstitutional. If a government has a legitimate state interest in controlling, containing, or
physically moving a crowd--even a peaceful crowd seeking to express itself politically--then its use
of reasonable means to realize such interest is not unconstitutional. We conclude that the use of
officers mounted on horses is not an unreasonable means for a police department to control crowds
when necessary and lawful.

 Likewise, we conclude that appellants have not met their burden to show that the
City's mounted-patrol "policy" was promulgated with deliberate indifference, which is a "stringent
test" for which a "showing of simple or even heightened negligence will not suffice." Piotrowski,
237 F.3d at 579 (citing Brown, 520 U.S. at 407). The record contains no evidence of actual
knowledge by the City or any of its policymakers that the mounted-patrol policy has been used in
other situations to squelch free speech and assembly.

 We also consider whether there is evidence that the City had constructive knowledge
that the alleged policy would lead to tortious conduct by police officers so as to establish the
deliberate-indifference requirement. See Brown, 520 U.S. at 407; City of Canton v. Harris, 489 U.S.
378, 390 n.10 (1989) ("It could . . . be that the police, in exercising their discretion, so often violate
constitutional rights that the need for further training must have been plainly obvious to the city
policymakers who, nevertheless, are 'deliberately indifferent' to the need."). Even if the use of the
mounted unit was not justified by a reasonable government interest to maintain peace and order but
was rather the result of intentional hostility or haphazard oversight, the existence of a policy that
countenances the use of horses to control crowds in circumstances where peace and order must be
maintained is not enough to put the government on notice that the policy could also be used solely
to deprive free-speech and assembly rights. We hold that appellants' allegations that the policy
could and did lead to a deprivation of free-speech and assembly rights do not amount to evidence
that the City consciously disregarded the likelihood that the policy would result in such a violation.

 Appellants also asserted that City police officers receive inadequate training on First
Amendment rights, and that this fact brings the case into the purview of City of Canton. See 489
U.S. at 390 (single violation of federal rights could trigger liability if accompanied by showing that
municipality has failed to train employees to handle recurring situations presenting obvious potential
for violations). However, the only evidence in the record reveals that officers do receive training on
the First Amendment as part of the state-mandated training for all peace officers. Also, even if the
training the officers received was inadequate, appellants have not pointed us to any evidence of how
the City would be on actual or constructive notice of such fact. See Brown, 520 U.S. at 407. Thus,
we hold that appellants failed to establish a fact issue on the first prong of their section 1983 claim.

 Even if the mounted-patrol procedures, the officers' admissions, or the inadequate
training did establish official "policy," the first and third Monell prongs are intertwined, requiring
the official policy to be the "causal link" to the constitutional violation. See id. at 405; Piotrowski,
237 F.3d at 580. Appellants needed to present evidence that the policy was the "moving force"
behind the constitutional violation. See Monell, 436 U.S. at 694. Assuming that there was a
constitutional violation, we fail to see how a "policy" authorizing the use of police officers mounted
on horses to control crowds in necessary circumstances--even allowing the horses to physically
contact citizens to move them one direction or another--was the "moving force" behind the alleged
violation on April 27. The alleged violation is that appellants were prevented by the APD from
reaching the traditional free-speech area and were not allowed to demonstrate anywhere on the
sidewalk they desired but were forced backwards towards a parking lot. The link between the
existence of a policy allowing for the use of mounted officers to control crowds to maintain peace
and order and the APD's preventing appellants from assembling where they desired is tenuous at
best. (7)

 The causal-link requirement entails a "high threshold of proof" and "must not be
diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation,
municipal liability collapses into respondeat superior liability.'" Piotrowski, 237 F.3d at 580
(quoting Snyder v. Trepagnier, 142 F.3d 791, 796 (5th Cir. 1998)). Here, it was not the ability to
use horses to control crowds that caused the APD to contain appellants on the northeast corner. 
Indeed, the mounted officers were merely one of the means used by the APD on that day to restrain
appellants. There is nothing inherent in the mounted-patrol "policy" that would lead an officer or
other City employee to use such measure to prevent citizens from exercising their rights to free
speech and assembly. Certainly, the APD could have used officers on foot to contain appellants,
which it did before and after the mounted officers appeared. We hold that appellants did not
establish a fact issue on the third Monell prong.

 Moreover, even if the evidence pointed to by appellants constituted official policy and
was the moving force behind a constitutional violation, we conclude that appellants failed to
establish a fact issue on the second Monell prong: that a municipal "policymaker" be charged with
actual or constructive knowledge of the alleged policy. Pineda, 291 F.3d at 328; Piotrowski, 237
F.3d at 578. Appellants were required to establish a fact issue as to whether actual or constructive
knowledge of the "policy" was attributable to the governing body of the City or officials to whom
the City had delegated policy-making authority. See Webster, 735 F.2d at 841. Only municipal
officials who have "final policymaking authority" may subject the government to section 1983
liability. St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). The "policymaker" requirement has
been strictly construed, requiring the policymaker to be one who "takes the place of the governing
body in a designated area of city administration," Webster, 735 F.2d at 841, and who (1) decides the
goals for a particular city function, (2) devises the means of achieving those goals, (3) acts in the
place of the governing body in the area of delegated responsibility, and (4) is not supervised except
as to the totality of performance. Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984).


[T]he delegation of policymaking authority requires more than a showing of mere
discretion or decisionmaking authority on the part of the delegee. . . . The governing
body must expressly or impliedly acknowledge that the agent or board acts in lieu of
the governing body to set goals and to structure and design the area of the delegated
responsibility, subject only to the power of the governing body to control finances
and to discharge or curtail the authority of the agent or board.



Id. If an official's actions are subject to effective review procedures, the official has not received
a complete delegation of authority and does not wield final responsibility so as to create municipal
liability. Praprotnik, 485 U.S. at 127; City of Lubbock v. Corbin, 942 S.W.2d 14, 20-21 (Tex.
App.--Amarillo 1996, writ denied) (building code inspector was not policymaker, even though he
wielded some discretion in imposing requirements and extending permits, because his actions were
subject to review by higher authority).

 To satisfy Monell, officials or governmental bodies must "speak with final
policymaking authority for the local governmental actor concerning the action alleged to have caused
the particular constitutional or statutory violation at issue." Jett v. Dallas Indep. Sch. Dist., 491 U.S.
701, 737 (1989). Whether a particular official has final policymaking authority is a question of state
law. Praprotnik, 485 U.S. at 123-24; Pembaur, 475 U.S. at 483-84. Appellants introduced no
evidence that the City had expressly or impliedly acknowledged that Officer Carlson acted in lieu
of the City's governing body with respect to setting goals and structuring the area of the delegated
responsibility--protecting the First Amendment rights of citizens. See Bennett, 728 F.2d at 769. 
Likewise, Sergeants Dukes and Hutto, although believing they acted in compliance with "official
policy" in summoning the mounted unit on April 27, cannot be said to represent the City so as to be
"subject only to the power of the governing body to control finances and to discharge or curtail the
authority of the agent." Id.

 It is true that one decision may result in municipal liability if a municipality's properly
constituted legislative body makes a single decision that is unconstitutional. See Pembaur, 475 U.S.
at 480; Owen v. City of Independence, 445 U.S. 622, 633 (1980) (city council passed resolution
firing plaintiff without pretermination hearing); Newport v. Fact Concerts, Inc., 453 U.S. 247, 252-53 (1981) (city council canceled license for performance because of dispute over content). However,
not every decision by municipal officers subjects the municipality to liability. Pembaur, 475 U.S.
at 482. The official must be responsible for establishing final government policy respecting such
activity before the municipality can be held liable. Id. at 482-83. Authority to make municipal
policy may be granted directly by a legislative enactment or may be delegated by an official who
possesses such authority. Id. at 483. "[M]unicipal liability under § 1983 attaches where--and only
where--a deliberate choice to follow a course of action is made from among various alternatives by
the official or officials responsible for establishing final policy with respect to the subject matter in
question." Id. That a particular official--even a policymaking official--has discretion in the
exercise of particular functions does not, without more, give rise to municipal liability based on the
exercise of that discretion. City of Houston v. Leach, 819 S.W.2d 185, 199 (Tex. App.--Houston
[14th Dist.] 1991, no writ) (citing Pembaur, 475 U.S. at 482-83).

 Appellants insist that Sergeant Boydston, as the APD's special-events supervisor,
organized the plans to handle the President's visit and the public's reaction to it, including the APD's
treatment of appellants. Boydston admitted that protest planning is all he does; appellants claim that
makes him an official policymaker. Likewise, they assert that Sergeant Dukes was delegated official
authority from the City as the mounted unit's commander, with "[s]upervision of the day to day
operations of the Mounted Unit." Officer Carlson also was an official policymaker, they allege,
because he had the sole responsibility for devising the mounted unit's tactics. Despite these
allegations, appellants have cited no evidence in the record or Texas authority indicating that the
exercise of these functions by these individual APD officers amounts to "policymaking authority."
Even a county sheriff with discretion to hire and fire employees may not be responsible for
establishing the county's official employment policy under the strict Monell requirement. See
Pembaur, 475 U.S. at 482 n.12. Appellants have failed to present anything more than a mere
assertion that the APD officers involved in the April 27 incident were responsible for establishing
City policy on First-Amendment rights. We hold that there is no evidence to support appellants'
assertion that the officers identified can be said to "decide the goals for a particular city function and
devise the means of achieving those goals" or to "act in place of the governing body." Bennett, 728
F.2d at 769.

 Because appellants did not establish a fact issue on any element of their section 1983
claim, the City was entitled to judgment as a matter of law. We affirm the judgment of the trial court
that directed a verdict in favor of the City on this claim.


State constitutional claims

 Appellants' second issue asserts that the trial court improperly directed a verdict for
the City on their state constitutional claims in equity, which sought an injunction, a declaratory
judgment, and attorney's fees. Appellants contend that such claims stand independently from the
federal claims and that the enumerated Monell elements essential to a section 1983 claim are not
required to support their allegation that the City violated their rights to free speech and assembly
under the state constitution. See City of Beaumont v. Bouillion, 896 S.W.2d 143 (Tex. 1995).

 Bouillion held that there is no implied private right of action for damages under the
Texas Constitution when an individual alleges the violation of speech and assembly rights. See id.
at 149. Appellants admitted at trial that they were not bringing a state constitutional tort but asserted
that certain common-law claims based on the state constitution survived Bouillion. The trial court
disagreed and granted the City's request for an instructed verdict. The trial court was correct that
Bouillion eliminates state common-law claims as well as any private right of action for damages for
violation of state free speech and assembly rights.

 However, the trial court instructed a verdict on all of appellants' "state constitutional
claims," including its suit for injunctive and declaratory relief, as well as attorney's fees. While
holding that individuals have no cause of action for damages resulting from constitutional violations,
Bouillion distinguished suits seeking equitable remedies: "Our review of the language of the
Constitution leads us to conclude that there is no basis from the text of the Constitution to assume
a party is given more than equitable protection." See id.; see also Jones v. Memorial Hosp. Sys., 746
S.W.2d 891, 893 (Tex. App.--Houston [1st Dist.] 1988, no writ). Thus, the instructed verdict on
all of appellants' state constitutional claims, including its equitable claims and its suit for declaratory
judgment, granted more relief than the City was entitled to under Bouillion. Thus, appellants' state
constitutional claims seeking injunctive and declaratory relief should have been determined by a jury
if the evidence raised a fact issue as to those claims. See Prudential, 29 S.W.3d at 77.


A. Injunctive relief

 The City contends that the trial court properly directed a verdict for the City on the
claim for injunctive relief because there was no evidence to support the necessary elements of an
injunction: a wrongful act, the existence of imminent harm, the existence of irreparable injury, and
the absence of an adequate remedy at law. See Texas Health Care Info. Council v. Seton Health
Plan, Inc., 94 S.W.3d 841, 853 (Tex. App.--Austin 2002, no pet.). The City then cites Envoy
Medical Systems, L.L.C. v. State, 108 S.W.3d 333, 335 (Tex. App.--Austin 2003, no pet.) for the
proposition that appellate review of a trial court's order granting or denying a permanent injunction
is strictly limited to a determination of whether the trial court has committed a clear abuse of
discretion. Although the City has cited the correct standard of review for the grant or denial of an
injunction, we must review the record to determine whether the evidence was sufficient to raise a
fact issue, see Prudential, 29 S.W.3d at 77, not whether the trial court abused its discretion, because
the trial court did not deny appellants' injunction request but directed a verdict for the City.

 Generally, the purpose of injunctive relief is to halt wrongful acts that are threatened
or in the course of accomplishment, rather than to grant relief against past actionable wrongs or to
prevent the commission of wrongs not imminently threatened. Texas Health Care Info. Council, 94
S.W.3d at 853 (citing Texas Employment Comm'n v. Martinez, 545 S.W.2d 876, 877 (Tex. Civ.
App.--El Paso 1976, no writ)). "An injunction will not lie to prevent an alleged threatened act, the
commission of which is speculative and the injury from which is purely conjectural." Markel v.
World Flight, Inc., 938 S.W.2d 74, 80 (Tex. App.--San Antonio 1996, no writ), quoted in Texas
Health Care Info. Council, 94 S.W.3d at 853. Fear or apprehension of the possibility of injury is not
sufficient. Frey v. DeCordova Bend Estates Owners Ass'n, 647 S.W.2d 246, 248 (Tex. 1983). Our
review of the record indicates that the evidence was not sufficient to raise a fact issue on imminent
harm. Whether there is a threat of imminent harm is a legal determination resting with the court. 
Operation Rescue-Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc., 975 S.W.2d 546,
554 (Tex. 1998).

 Appellants had the burden to present evidence that future use of the mounted-patrol
"policy" would result in imminent harm to other citizens seeking to express their free-speech and
assembly rights. See Christensen v. Integrity Ins. Co., 719 S.W.2d 161, 163 (Tex. 1986) (party
seeking injunction has burden of showing that clear equity demands injunction); Frey v. DeCordova
Bend Estates Owners Ass'n, 632 S.W.2d 877 (Tex. App.--Fort Worth, 1982), aff'd, 647 S.W.2d 246
(Tex. 1983) (party seeking injunction has burden of proof on all four necessary showings). That the
mounted-patrol "policy" remains on the books is not enough to show imminent harm. The APD has
not threatened to use the "policy" against political protestors or appellants specifically. Although
appellants assert that they are politically active and will continue to stage protests, they have not
pointed to particular planned protests and coincident APD responses indicating that the protestors
will be prevented from expressing themselves or assembling. Nor have they presented evidence that
the APD will squelch their future speech because of its content or viewpoint. All of their claims
supporting an injunction rely on past events and merely speculate that something similar might
happen again. Appellants failed to sustain their burden of establishing imminent harm. Thus, the
trial court properly directed a verdict for the City on appellants' claims for injunctive relief.


B. Declaratory relief

 The declaratory judgments act may be used to clarify constitutional imperatives. See
Frasier v. Yanes, 9 S.W.3d 422, 427 (Tex. App.--Austin 1999, no pet.); see also Hays County v.
Hays County Water Planning P'ship, 106 S.W.3d 349, 359 (Tex. App.--Austin 2003, no pet.) (party
may bring declaratory-judgment action to determine whether commissioners court has acted outside
of its constitutional and statutory authority). Although declaratory judgments are not purely legal
or equitable in nature, see Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891,
895 (Tex. 1970), they are not prohibited by Bouillion's holding that there is no implied right of
action for damages under the state constitution. They are more akin to the equitable relief afforded
under the state constitution in Jones v. Memorial Hospital Systems, 746 S.W.2d 891, as affirmed in
Bouillion. 896 S.W.2d at 149. Thus, a verdict should not have been directed on appellants' claims
for declaratory relief if the evidence raised a fact issue that appellants' state constitutional rights were
violated. See Szcepanik, 883 S.W.2d at 649.

 A declaratory judgment will declare the rights, duties, or status of the parties only in
an otherwise justiciable controversy, Frasier, 9 S.W.3d at 427. The justiciable controversy
appellants present is whether the City violated their rights under the state constitution. See Iranian
Muslim Org. v. City of San Antonio, 615 S.W.2d 202, 209 (Tex. 1981) (question of whether
irreparable injury occurred when City refused to issue parade permits was not moot but active
controversy despite fact that particular date and conditions under which applicants sought permit no
longer existed). The Texas constitutional guarantees of freedom of speech and expression have been
held to constitute an independent legal basis for a cause of action claiming an infringement of the
right of free speech. Jones, 746 S.W.2d at 893. Additionally, if the underlying dispute between the
parties is one "capable of repetition, yet evading review," it is still properly before a court, despite
the fact that the restraint upon free speech was short-lived and no longer exists. Iranian Muslim
Org., 615 S.W.2d at 209 (citing Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 546 (1976)); see also
State v. Lodge, 608 S.W.2d 910, 911-12 (Tex. 1980).

 We thus turn to appellants' claim for declaratory relief that the City's actions violated
their free-speech rights under the Texas Constitution. We recognize that the supreme court has
suggested that the Texas free-speech clause may be "broader" in some respects than its federal
counterpart. See Ex parte Tucci, 859 S.W.2d 1, 5 (Tex. 1993); Davenport v. Garcia, 834 S.W.2d
4, 10 (Tex. 1992). But, in its most recent free speech decisions, the court has held that unless a party
can show through the text, history, and purpose of article I, section 8, that the state constitution
affords more protections than the First Amendment in regard to that case, courts should assume that
free speech protections are the same under both constitutions. See Texas Dept. of Transp. v. Barber,
111 S.W.3d 86, 106 (Tex. 2003) (after deciding case based on U.S. Constitution, court stated, "Here,
Barber has not articulated any reasons based on the text, history, and purpose of Article I, section
8 to show that its protection of noncommercial speech is broader than that provided by the First
Amendment under the circumstances presented."); Operation Rescue, 975 S.W.2d at 559 (Tex.
1998) ("It is possible that Article I, Section 8 may be more protective of speech in some instances
than the First Amendment, but if it is, it must be because of the text, history, and purpose of the
provision, not just simply because."). Appellants have not articulated any reason why the Texas free
speech clause would be more protective of their rights than the First Amendment. Accordingly, we
will follow the familiar first-amendment jurisprudence in addressing their Texas free-speech claims.

 As we have discussed above, the City's crowd-control policies are not facially
violative of the First Amendment. We thus consider only whether these policies, as applied against
the appellants in this case, violated the First Amendment.

 It is clear that "[t]he First Amendment forbids the government to regulate speech in
ways that favor some viewpoints or ideas at the expense of others." Members of City Council v.
Taxpayers for Vincent, 466 U.S. 789, 804 (1984). But the First Amendment does not guarantee the
right to communicate one's views at all times and places or in any manner. Heffron, 452 U.S. at 647. 
Expression may be subject to reasonable time, place, and manner restrictions. Clark, 468 U.S. at
293. Thus, the United States Supreme Court has employed a two-tier approach in analyzing speech
restrictions. For the more restrictive tier--"regulations that suppress, disadvantage, or impose
differential burdens upon speech because of its content"--the court applies "the most exacting
scrutiny." Turner Broad. Sys., Inc. v. Federal Communications Comm'n, 512 U.S. 622, 642 (1994). 
Such content-based regulations are presumptively invalid, and they can withstand strict scrutiny only
if precisely drawn to serve a compelling state interest. See R.A.V. v. City of St. Paul, 505 U.S. 377,
382 (1992); Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n, 447 U.S. 530, 540
(1980). For the less restrictive tier--"regulations that are unrelated to the content of speech"--the
Court applies an "intermediate level of scrutiny." Turner Broad. Sys., Inc., 512 U.S. at 642. Such
content-neutral regulations are valid provided they are narrowly tailored to serve a substantial
governmental interest and do not unreasonably limit alternative channels for communicating the
information. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986).

 The first step in our analysis of the appellants' claim under the Texas free-speech
clause must determine whether the restrictions placed on the protestors' free expression were
content-based. To be content-neutral, a restriction must be both viewpoint-neutral and subject-matter neutral. See Barber, 111 S.W.3d at 93. To be viewpoint-neutral, a regulation must not be
based on the message's ideology. Boos v. Barry, 485 U.S. 312, 321 (1988). To be subject-matter
neutral, a regulation must not be based on the speech's topic. Carey v. Brown, 447 U.S. 455, 471
(1980). However, the Supreme Court has treated some content-based regulations as content-neutral
if the regulations are motivated by a permissible content-neutral purpose. See City of Renton, 475
U.S. at 48 (court upheld ordinance disallowing adult theaters, concluding that ordinance was aimed
not at content of films, but rather at "secondary effects"--such as crime and deteriorating property
values--that such theaters caused).

 In this case, the appellants have adduced evidence that some people who were
supporters of President Bush were allowed to reach the free-speech area, while the protestors' access
to the area was blocked. One protestor who reached the free-speech area by a circuitous route was
allegedly asked by a police officer to roll up his sign protesting the President. In reviewing a directed
verdict, we are required to view this evidence in the light most favorable to the appellants and
disregard all contrary evidence and inferences. Szcepanik, 883 S.W.2d at 649. Applying this
standard of review, there is evidence that the City was differentially applying its policies to pro-Bush
versus anti-Bush demonstrators, "sorting out" protestors so as to "suppress, disadvantage, or impose
differential burdens upon speech because of its content." See Turner Broad. Sys., Inc., 512 U.S. at
642.

 On the other hand, there is some evidence to support the City's contentions that it was
responding to an order from the secret service to prevent the appellant protestors from reaching the
free-speech area. One might infer that such an order would have been motivated by presidential
security concerns, but the record is vague on this point. And, while such an interest might be
significant or even compelling, merely invoking it does not establish that the restriction is
sufficiently tailored to serve that interest or leaves open ample adequate alternative channels of
communication. See Operation Rescue, 975 S.W.2d at 556 (record did not demonstrate that buffer
zones against protestors was sufficiently tailored to protect privacy and property interests); Bay Area
Peace Navy v. United States, 914 F.2d 1224, 1227-29 (9th Cir. 1990) (while asserted government
interest in protecting officials from attack was significant, government did not show why seventy-five yard security zone imposed to protect officials from protestors was properly tailored to protect
that interest or left open ample alternative channels for communication).

 On the record before us, it is not even possible to discern if the City's actions were
content-neutral or content-based. If content-neutral, the City's actions are to be measured against
a standard of intermediate scrutiny that permits regulation of the time, place, and manner of
expression if such regulation is narrowly tailored to serve a significant government purpose, so long
as it leaves open ample alternative channels of communication. Operation Rescue, 975 S.W.2d at
556 (citing Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)); see also City of Renton, 475
U.S. at 48. If the restrictions imposed were based on the content of the protestors' message, they
must survive a stricter scrutiny to pass constitutional muster: "[content-based restrictions] on speech
in public forums are strictly scrutinized, and none is permitted by the First Amendment except as
necessary to serve a compelling state interest and narrowly drawn to achieve that end." Operation
Rescue, 975 S.W.2d at 556 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37,
44-46 (1983)).

 While this case arose amid the maelstrom of the contested presidential election in
2000, we must interpret and apply our constitutional protections of free expression in a manner
transcending that contentious debate. As the Texas Supreme Court observed in addressing the
constitutionality of speech restrictions in the volatile context of the abortion debate:


The voice seeking audience in this case is that of those who oppose abortion. The
conflict is with businesses and individuals who seek to provide abortion services in
lawful ways and to enjoy their property and privacy interests as other citizens. The
district court was called upon to find the boundary between the two and prevent
trespass by one side against the other. That boundary cannot be determined by the
subject matter of the dispute, nor can the personal sympathies of judges to one side
or the other affect their duty to draw lines. No one issue is entitled to greater access
to the public forum than another. "Freedom of discussion, if it would fulfill its
historic function in this nation, must embrace all issues about which information is
needed or appropriate to enable the members of society to cope with the exigencies
of their period." The issue here is abortion; in the next case it will be different. The
rule of this case must be given application in the next.



Operation Rescue, 975 S.W.2d at 555-56 (internal citations omitted).

 Based on this record and viewing the evidence in the light most favorable to the
appellants while disregarding all contrary evidence and inferences, see Szcezepanik, 883 S.W.2d at
649, we conclude that the question of whether the City violated appellants' rights under the state
constitution cannot be decided as a matter of law. We accordingly hold that the trial court erred in
directing a verdict on appellants' claim for declaratory relief under the state constitution.


CONCLUSION


 Because appellants did not establish a fact issue on any element of their section 1983
claim for damages, we affirm the judgment of the trial court that directed a verdict in favor of the
City on that claim. We also affirm the directed verdict denying injunctive relief under the state
constitution because appellants failed to establish imminent harm that would entitle them to an
injunction. However, we hold that the trial court erred in granting a directed verdict on the
appellants' claims for declaratory judgment that the City violated their free speech and right of
assembly under the state constitution. We reverse that portion of the judgment and remand for
further proceedings consistent with this opinion.



 __________________________________________

 Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Pemberton: Opinion by Justice B. A. Smith;

 Concurring Opinion by Justice Patterson; Concurring Opinion by Justice Pemberton

Affirmed in Part; Reversed and Remanded in Part

Filed: July 15, 2004

1. Section 1983 provides in relevant part:


 Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes
to be subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress.


42 U.S.C.A. § 1983 (West 2003).
2. Texas does not allow a damage remedy for constitutional torts. See City of Beaumont v.
Bouillion, 896 S.W.2d 143, 149 (Tex. 1995).
3. The trial court allowed the trial to proceed to the jury with respect to the individual officer-defendants, Officers Carlson and Farr, on the federal claims only; the jury found that the officers had
not violated the federal constitutional rights of any of the appellants. We are concerned with only
the court's judgment as to the City, because appellants do not appeal the portion of the judgment
pertaining to the individual officers.
4. A municipality is included within the purview of section 1983 liability. Monell v.
Department of Soc. Servs., 436 U.S. 658, 688-89 (1978). 
5. There is no written motion for directed verdict in the record. At trial, the City argued that
section 1983 liability requires "that there is a custom or policy of abuse, which we haven't seen any
evidence of, and that is so persistent and outrageous as to be either an illegal written policy or so
widespread as to put the municipality on notice that there's a problem and they failed to take action,
so that it is, unofficially, their policy. . . . What's required is notice to the municipality of, 'You
knew or should have know that this is . . . clearly in violation of someone's rights.'" The City relied
on Pineda v. City of Houston, 291 F.3d 325 (5th Cir. 2002), which discussed two possible theories
of liability: (1) an unwritten custom or policy, of which the policymakers had actual or constructive
knowledge; or (2) a failure to train police officers, under which a plaintiff must show inadequate
training procedures, that inadequate training caused the constitutional violation, and that the
policymakers were deliberately indifferent to the potential harm. See id. at 328, 331-32. The City
urged that neither theory was supported by the evidence.
6. Justice Patterson's concurring opinion cites testimony by the officers that they acted
pursuant to the City's official policy as evidence that the City does not contest the first Monell prong. 
However, that the officers believed they were following an official "policy" of the City--or even if
they in fact were--does not mean that "policy" is the type contemplated by Monell and its progeny,
as discussed infra.
7. Although appellants' petition did allege that the use of mounted contact amounted to
excessive force, appellants conceded at trial that they were not asserting a cause of action under the
state and federal constitutional protections against the use of excessive force. See U.S. Const.
amend. IV; Tex. Const. art. I, § 13.