# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

—— NO. 03-03-00499-CV ——

**James A. Hopkins and Jean C. Hopkins, Appellants**

**v.**

**State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. GV100300, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After a jury trial, appellants James A. Hopkins and Jean C. Hopkins were awarded damages for the condemnation of a drainage easement on their property. In eighteen issues, they challenge the trial court's directed verdict on certain claims, the amount of prejudgment and postjudgment interest, denial of costs, and portions of the jury charge and final judgment. We will affirm in part and reverse and remand in part.

### BACKGROUND

On December 20, 1990, the State of Texas, acting through the Travis County Attorney's office, filed a Statement in Condemnation for the condemnation of a drainage easement

on property owned by appellants along the frontage road of IH-35 near Slaughter Lane.[1] *See* Tex. Prop. Code Ann. § 21.012 (West 2004). The Statement recites that the easement would be used for "the constructing, replacing, operating, rebuilding, relocating and maintaining a drainage waterway as part of the improvements to a state highway." After a hearing on July 11, 1991, special commissioners awarded appellants $35,462 in compensation. *See id*. § 21.014 (West 2004). Appellants timely filed objections to the award. *See id*. § 21.018 (West 2004). On August 21, the State filed a notice that it had deposited $35,462 into the registry of the court. *See id*. § 21.021 (West 2004). That same day, a writ of possession was granted. On October 3, appellants filed a motion to transfer the money into an interest-bearing account. The court's order granting the request was signed and approved by the parties.

On February 16, 2001, almost ten years after the award, appellants filed their First Amended Objections to the Award of the Special Commissioners.[2] On February 20, the court granted appellants' motion to transfer the cause to Travis County district court. *See id*. § 21.002 (West 2004) (county court shall transfer eminent domain case to district court if court determines that case involves issue of title or other matter that cannot be fully adjudicated in that court). Subsequently, trial on the merits was set for early February 2003.

On January 31, 2003, appellants filed their Second Amended Objections to the Award of the Special Commissioners and Cross Claims, adding causes of action for nuisance and violations

---

[1] The easement is on the same property along the frontage road of IH-35 that was at issue in *Hopkins v. Hopkins*, 03-03-00629-CV.

[2] Although the case had been set for trial on at least three different dates, continuances were granted for various reasons.

of the water code. *See* Tex. Water Code Ann. § 11.086 (West 2000). The State filed a motion to strike the amended pleadings, arguing that they were prejudicial and constituted unfair surprise because they raised new and substantive issues only ten days before trial on the merits, and approximately eleven and a half years after the original objections to the original award. The State also argued that the pleadings were in conflict with a stipulation the parties had entered into in May 2000, agreeing that the State had met all legal requirements to take the property, "subject only to the payment of compensation as required under the applicable provisions of the Property Code."

The case proceeded to trial before a jury. At the close of appellants' case, the State moved for a directed verdict on the crossclaims of nuisance and violations of the water code. The trial court granted the motion. The case was then submitted to the jury, who unanimously found that "the fair market value of the 0.242 acre easement interest taken on August 21, 1991 by the State of Texas without any consideration of the condemnation" was $38,702. The jury also unanimously found that the decrease in fair market value "of the remainder of the 7.81 acres of the [appellants'] land, immediately after the taking on August 21, 1991, taking into consideration the effect of the condemnation on the value of the remaining property," was $174,721. On May 12, the trial court entered a final judgment awarding appellants damages and prejudgment interest.

Appellants filed a "Motion to Modify Judgment; Second Amended Motion to Render Judgment; and in the alternative, Motion for New Trial." The State made an unconditional tender to appellants of the entire amount awarded in the judgment, $258,414.54.[3] In a letter dated May 19,

---

[3] The tender was by check in the amount of $206,189.50 in addition to $52,229.04 that was already in the registry of the court because the original deposit of $35,462 had already accrued $16,767.04 in interest.

3

2003, appellants refused to accept payment, and on August 4, the State deposited the award into the registry "in order to stop any postjudgment interest except as might be earned by the deposit of the original award in the interest bearing account created by agreement of the parties in 1991."

Appellants' motion to modify and motion for new trial were overruled by operation of law, and this appeal ensued. Subsequently, Jean Hopkins filed a motion in this Court notifying us that she had discharged the Hopkinses' son, Mark A. Hopkins, as her attorney. She also sought to disqualify him from representing either her or James in this case. The State joined in her motion.

We will first discuss the merits of the appeal, then determine whether Mark Hopkins should be disqualified from representing Jean or James in this appeal.

## DISCUSSION

**Prejudgment interest**

In their first issue, appellants contend that the trial court erred by (1) miscalculating the rate and term for prejudgment interest and, (2) by finding that the agreed order, which placed the amount awarded by the special commissioners into an interest bearing account, constituted an agreement that superceded the statutory rate of prejudgment interest.

We review the trial court's award of prejudgment interest for an abuse of discretion. *Wilmer-Hutchins Indep. Sch. Dist. v. Smiley*, 97 S.W.3d 702, 706 (Tex. App.—Dallas 2003, pet. denied). The trial court may abuse its discretion by failing to analyze or apply the law correctly, *see Powell v. Stover*, 165 S.W.3d 322, 324 (Tex. 2005), because a court "has no 'discretion' in determining what the law is or applying the law to the facts." *In re Prudential Ins. Co. of Am. &*

4

*Four Partners, L.L.C.*, 148 S.W.3d 124, 135 (Tex. 2004) (quoting *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).

Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985)). The landowner's entitlement to prejudgment interest in condemnation cases derives from article I, section 17 of the Texas Constitution. *See* Tex. Const. art. I, § 17; *Whittington v. City of Austin*, 174 S.W.3d 889, 906-07 (Tex. App.—Austin 2005, pet. denied) (citing *State v. Hale*, 146 S.W.2d 731, 738 (Tex. 1941)); *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 388-89 (Tex. App.—Houston [14th Dist.] 2004, no pet.). In these cases, prejudgment interest is awarded if the landowner appeals from the special commissioners' award, the condemnor opts to deposit the amount of the special commissioners' award into the court's registry to gain the right of possession, and the trial court ultimately awards damages in excess of the special commissioners' award. *Whittington*, 174 S.W.3d at 906-07; *see generally Robert H. Pemberton, A Guide to Recent Changes and New Challenges in Texas Prejudgment Interest Law*, 30 Tex. Tech L. Rev. 71, 118 (1999). The longstanding rule has been that prejudgment interest begins to accrue on the date of the constitutional taking—the date the condemnor pays the amount of the special commissioners' award into the court's registry and gains the right to possess the property. *Whittington*, 174 S.W.3d at 907; *see Hale*, 146 S.W.2d at 738; *Texan Land & Cattle Co.*, 138 S.W.3d at 389; *City of Austin v. Foster*, 623 S.W.2d 672, 674-75 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.). The landowner does not

receive prejudgment interest on the amount of the deposit, as he or she has the right to use those funds, but only on any additional amount awarded by the trial court, which, in concept, represents funds the landowner was wrongfully deprived of prior to judgment. *Whittington*, 174 S.W.3d at 907; *see Housing Auth. of Dallas v. Shambry*, 252 S.W.2d 963, 966 (Tex. Civ. App.—Austin 1952, writ ref'd n.r.e.) ("in [condemnation] cases where the amount of damages is the only issue, the deposit is the equivalent of a tender and prevents the running of interest to the extent of the amount of the deposit.").

Here, in conformance with the jury verdict, the trial court awarded damages of $38,702 for the easement and $174,721 for damages to the remainder of the property, totaling $213,423. The State had deposited $35,462 into the registry of the court following the commissioner's award in 1991; prejudgment interest is not owed on that amount. *See Hale*, 146 S.W.2d at 738; *Whittington*, 174 S.W.3d at 907. However, prejudgment interest is owed on $177,961: the amount of damages ultimately awarded in excess of the special commissioners' award. *See Whittington*, 174 S.W.3d at 907; *see also Shambry*, 252 S.W.2d at 966.

### *Entitlement to prejudgment interest*

As an initial matter, the State argues that prejudgment interest should not be awarded because there was no "actual physical possession" and therefore appellants were never deprived of the use of the land. This argument fails because the State took actual possession of the easement when the court granted its request for a writ of possession after the deposit was made in August 1991. Appellants are entitled to an award of prejudgment interest, but we must consider the proper

rate and term of the interest on $177,961—the amount ultimately awarded in excess of the special commissioners' award.

### *Statutory rate versus actual accrual rate*

Appellants contend that the award of prejudgment interest should have been calculated at the statutory rate of 10 percent. *See* Tex. Fin. Code Ann. § 304.201(2) (West Supp. 2005). Generally, the prejudgment interest rate in a condemnation case is equal to the postjudgment interest rate at the time of judgment and is computed as simple interest.[4] *Id.* However, the State argues that appellants are not entitled to prejudgment interest at the statutory rate because of the parties' motion and corresponding agreed order which transferred the original deposit of the award from the registry of the court into an interest bearing account held by the court. According to the State, the motion and agreement had the legal effect of limiting appellants' recovery of prejudgment

---

[4] The postjudgment interest rate at the time of judgment was:

(1) the auction rate quoted on a discount basis for 52-week treasury bills issued by the United States government as most recently published by the Federal Reserve Board before the date of the computation;

(2) 10 percent if the auction rate described by Subdivision (1) is less than 10 percent; or

(3) 20 percent if the auction rate described by Subdivision (1) is less than 20 percent.

Tex. Fin. Code Ann. § 304.003(c) (West 1998). Section 304.003 was amended in 2003 and 2005. We will cite to the 1998 version because the notes to the 2003 legislation provide that the changes in law only apply in cases in which a final judgment was signed or subject to appeal on or after the effective date of the Act. The final judgment in this case was signed May 12, 2003, but the Act was not effective until June.

7

interest on the excess amount of damages—which had not yet been awarded—to the rate actually accrued by the account, an average annual rate of 4.5974%, instead of the statutory rate of 10%. *See id.* The State also argues that because the parties' May 2000 agreement does not expressly mention prejudgment interest, appellants are barred from recovering it.[5]

In the final judgment, the court recited that the motion to deposit the initial payment into an interest bearing account constituted

> an agreement that superceded the entitlement to prejudgment interest on the award and that the actual rate of interest earned thereon is a fair rate for calculation of interest on the additional compensation determined by the jury. Interest earnings on such deposit has been variable through the years at an effective annual rate of 4.5974%, with a balance of the original award and interest accumulations as of March 31, 2003 of $52,229.04.
>
> Accordingly, the court calculates prejudgment interest due and owing as follows:
>
> 1.  **$38,702** @ 4.5974% = $1,779.28/yr. for 11.75 years = $20,906.54
>
>     Total $38,702 + $20,906.54 = **$59,608.54**
>
> 2.  **$174,721** @ 4.5974% = $669.385/mo. calculated from October 1, 2000 (the date the counterclaim for damages to the remainder was filed) for 33 months = $22,089.70
>
>     Total $174,721 + $22,089.70 = **$196,810.70**
>
> 3.  Total of damages and prejudgment interest:  $59,608.54 + $196,810.70
>                                                  =      $258,418.54
> 4.  Less credit for Clerk's interest deposit:    -   52,229.04
> 5.  Total due from Condemnor:                        $206,189.50

---

[5] In May 2000, the parties signed a handwritten agreement stipulating that "The State of Texas, condemnor, has met all legal requirements to take the property interests made the basis of this suit as described in Condemnor's Statement in Condemnation, subject only to the payment of compensation as required under the applicable provisions of the Property Code." *See* Tex. R. Civ. P. 11.

We conclude that the May 2000 agreement cannot be fairly read to waive appellants' possible claim of prejudgment interest on future damages in excess of the special commissioners' original award. First, it does not state that appellants were waiving their right to an award of prejudgment interest. Furthermore, at the time the agreement was made, appellants were not entitled to prejudgment interest because they had not yet been awarded an amount exceeding the amount awarded by the special commissioners. *See Whittington*, 174 S.W.3d at 907; *see also Shambry*, 252 S.W.2d at 966. Instead of waiving their right to interest, the record suggests that the parties were stipulating that the State had the right to condemn the property, an issue that appellants had previously challenged.

Moreover, appellants' motion to transfer funds from the registry into an interest bearing account, and the corresponding agreed order, did not explicitly or implicitly waive their future right to recover the statutory rate of prejudgment interest on any excess amount that might be awarded. Appellants' right to prejudgment interest at the statutory rate is derived from the constitution, a claim that was not waived by the language of the agreements. *See* Tex. Const. art. I, § 17. For all of these reasons, we hold that the trial court erred in awarding prejudgment interest at the actual average annual accrual rate of 4.5974%. Appellants were entitled to the statutory rate of 10% prejudgment interest on $177,961—the amount ultimately awarded in excess of the special commissioners' award. *See* Tex. Fin. Code Ann. § 304.201(2).

### *Accrual date of prejudgment interest on crossclaim*

Next, appellants argue that the court erred by limiting the term of prejudgment interest awarded on the remainder damages. The court based its award on the filing date of the crossclaim

9

instead of the actual date of damage. Appellants assert that the term should be based on either (1) the 4,519 days between the date the original petition was filed and the date of judgment, or (2) the 4,282 days between the deposit of the award into the registry and the date of judgment.

The Texas Constitution provides that no person's property shall be damaged or applied to public use without adequate compensation being made. *See* Tex. Const. art. I, § 17. Therefore, the State's obligation to pay compensation in the form of interest begins when the damage is inflicted to the property. *City of Sweetwater v. McEntyre*, 232 S.W.2d 434, 437-38 (Tex. Civ. App.—Eastland 1950, writ ref'd n.r.e.); *see Hale*, 146 S.W.2d at 737-38. Damage is inflicted as of the date of the constitutional taking—in this case, the date the State deposited the amount of the special commissioners' award into the court's registry and gained the right of possession. *Whittington*, 174 S.W.3d at 907; *see Hale*, 146 S.W.2d at 738; *Texan Land & Cattle Co.*, 138 S.W.3d at 389; *see also* Tex. Prop. Code Ann. § 21.021. Thus, notwithstanding the fact that the crossclaim was not filed until October 2000, we hold that prejudgment interest should have been awarded at the statutory rate for the time period of August 21, 1991, until the date of the judgment, May 12, 2003.[6]

Because the court abused its discretion by miscalculating both the rate and accrual date of prejudgment interest, we sustain appellants' first issue.

---

[6] Furthermore, we note that at the jury charge conference, appellants' attorney mentioned that the State's requested charge stated that "the day of taking in this case" was August 22, while appellants' requested charge recited the date as August 21. Appellants' attorney stated that "I think the evidence reflects those two dates. There's not a dime's worth of difference as far as I'm concerned." The court stated it would phrase the date as "on or about August 21" but the charge questions state that the easement was taken on August 21, 1991.

10

**Recovery of costs**

In their second issue, appellants argue that the trial court erred by failing to award costs in their favor.

Subsection (a) of section 21.047 of the property code provides as follows:

> Special commissioners may adjudge the costs of an eminent domain proceeding against any party. If the commissioners award greater damages than the condemnor offered to pay before the proceedings began or if the decision of the commissioners is appealed and a court awards greater damages than the commissioners awarded, the condemnor shall pay all costs. If the commissioners' award or the court's determination of the damages is less than or equal to the amount the condemnor offered before proceedings began, the property owner shall pay the costs.

Tex. Prop. Code Ann. § 21.047(a) (West 2000). After the special commissioners have assessed damages, they shall make and sign a written statement of the accrued costs of the proceeding, naming the party against whom the costs are adjudged, and file the statement with the court. *Id*. § 21.048 (West 2000).

The purpose of section 21.047(a) is to encourage the condemnor to offer the true value of the land and to discourage the property owner from making extravagant demands in their attempt to agree through negotiations preceding the filing of statutory proceedings. *State v. Schmidt*, 894 S.W.2d 543, 545 (Tex. App.—Austin 1995), *overruled on other grounds by Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172 (Tex. 2004). The amount of damages finally recovered by the property owner determines the issue of adjudging costs. *Schmidt*, 894 S.W.2d at 545; *see* Tex. Prop. Code Ann. § 21.047. If the property owner ultimately recovers more than the condemnor's offer, whether by the administrative award of the special commissioners or the

11

judgment of the trial court, then "the condemnor shall pay all costs." *Schmidt*, 894 S.W.2d at 545 (quoting Tex. Prop. Code Ann. § 21.047). However, if the award of the commissioners or the trial court, whichever is final, is equal to or less than the amount of the condemnor's offer, "the property owner shall pay the costs." *Id.*

The State offered appellants $35,475 as compensation for the easement.[7] The final judgment awards appellants $38,702 for the easement and $174,721 for damages to the remainder of the property.

The State argues that fees for attorneys, experts, and other expenses are incidental expenses which are not recoverable, citing *City of Houston v. Biggers*, 380 S.W.2d 700, 705 (Tex. App.—Houston [1st Dist.] 1964, writ ref'd n.r.e.). However, *Biggers* does not discuss section 21.047 and is distinguishable. In *Biggers*, the court held that the landowners were not entitled to recover their expenses when their property was not ultimately taken. *See id.* at 704-05 (passage of ordinance including land in what was contemplated as civic center did not constitute taking; act was purely legislative and could be changed at any time). In this case, however, an actual taking occurred that was compensatory with damages that exceeded the offer by the State.

There is no dispute that appellants were ultimately awarded damages that exceeded the State's offer. Therefore, the State is required to pay appellants' costs.[8] *See* Tex. Prop. Code Ann. § 21.047. We sustain appellants' second issue.

---

[7] The offer states that the figure had "been rounded up from" $35,462.

[8] The State also asserts that it should not be required to pay costs because appellants did not introduce evidence of the amount of costs. However, costs are taxed by the clerk of the court. *See*, *e.g.*, Tex. R. Civ. P. 162, 622.

12

**Postjudgment interest**

In their third issue, appellants contend that the trial court erred by failing to award them postjudgment interest. The State argues that "[w]hile [appellants] may be entitled to postjudgment interest in theory," it is not reversible error in this case because (1) the agreements do not provide for postjudgment interest; and (2) appellants refused to accept payment of the judgment.

A money judgment of a court in this state must specify the postjudgment interest rate applicable to that judgment. Tex. Fin. Code Ann. § 304.001 (West Supp. 2005). Furthermore, a money judgment of a court of this state to which section 304.002 of the finance code does not apply,[9] including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment interest at the rate determined under section 304.003 of the finance code. *Id*. § 304.003 (West 1998).[10] Postjudgment interest begins to accrue on the date the judgment is rendered and ends on the date the judgment is satisfied. *See id*. § 304.005(a) (West Supp. 2005).

Furthermore, it is a longstanding principle that "a litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom." *Texas State Bank v. Amaro*, 87 S.W.3d 538, 544 (Tex. 2002) (quoting *Carle v. Carle*, 234 S.W.2d 1002, 1004 (Tex. 1950)). However, there is a narrow exception to this rule: if an appellant "accepts only that which an appellee concedes, or is bound to

---

[9] Section 304.002 generally applies to judgments based on contracts that provide for interest or time price differential. *See* Tex. Fin. Code Ann. § 304.002 (West Supp. 2005).

[10] Although section 304.003 was amended in 2003 and 2005, we will cite to the 1998 version because the notes to the 2003 legislation provide that the changes in law only apply in cases in which a final judgment was signed or subject to appeal on or after the effective date of the Act. The final judgment in this case was signed on May 12, 2003, shortly before the effective date of June 20, 2003.

concede, to be due him under the judgment he is not estopped to prosecute an appeal which involves only his right to a further recovery." *Id.* (quoting *Carle*, 234 S.W.2d at 1004). An appeal may be taken where the reversal of the judgment challenged cannot possibly affect appellants' right to the benefit accepted. *Carle*, 234 S.W.2d at 1004; *Bloom v. Bloom*, 935 S.W.2d 942, 947 (Tex. App.—San Antonio 1996, no writ).

Postjudgment interest is not a punishment inflicted on a judgment debtor for exercising the right to appeal. *Miga v. Jensen*, 96 S.W.3d 207, 212 (Tex. 2002). Instead, like prejudgment interest, postjudgment interest is simply compensation for a judgment creditor's lost opportunity to invest the money awarded as damages at trial. *Id.* (citing *Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 528). When a judgment creditor has received an unconditional tender of the money awarded, and may invest it as he chooses, there is no need for the continuing accrual of postjudgment interest. *See id.* (citing Tex. Fin. Code Ann. § 304.005(a) (West Supp. 2005)). This is true whether or not an appeal of the underlying judgment is ongoing. *See id.* (citing Tex. Fin. Code Ann. § 304.005(b)).

For the same reasons that the agreements did not bar appellants' recovery of the statutory rate of prejudgment interest, the agreements likewise do not bar recovery of postjudgment interest. Furthermore, appellants' appeal falls under the narrow exception expressed in *Carle*. *See* 234 S.W.2d at 1004. Because they are seeking additional money in the appeal, and the State did not appeal the judgment, only appellants' right to a further recovery is affected. *See Amaro*, 87 S.W.3d at 544; *Carle*, 234 S.W.2d at 1004. Therefore, the "acceptance of benefit" doctrine did not prevent appellants from withdrawing the money out of the registry of the court. Under these facts, appellants

14

received an unconditional tender of the money awarded and could have invested it as they chose. *See Miga*, 96 S.W.3d at 212. Thus, there is "no need for the continuing accrual of postjudgment interest" when the State did not file an appeal and appellants could have withdrawn the unconditional tender at any time.

We hold that, under the facts in this case, the State's unconditional tender terminated the accrual of postjudgment interest upon the deposit of the judgment into the registry. *See id*. Therefore, appellants were entitled to postjudgment interest from the date of the judgment, May 12, 2003, until payment of the judgment was unconditionally tendered on August 4, 2003. We sustain appellants' third issue in part and overrule it in part.

**Clarity of the judgment regarding amount held in the registry**

In their fourth issue, appellants assert that the judgment does not clearly award them the $35,462 held in the registry of the court along with the interest that accrued while in the interest-bearing account. They acknowledge that the State "does not contest [their] right to receive the award deposit (and the interest on such deposit), as indicated by its motion for judgment," but argue that regardless of the State's agreement, "the judgment itself must clearly grant this relief."

The State took possession of the condemned property after it deposited the amount of the special commissioners' award into the registry of the court. *See* Tex. Prop. Code Ann. § 21.021(a)(2). When it deposited the money, the parties agreed to transfer the money into an interest bearing account. Under these circumstances, "[t]he court shall pay the interest that accrues from the deposit or investment to the condemnor." *Id*. § 21.021(d). Thus, the court was not required to award the interest to appellants. The trial court awarded appellants the underlying amount in

15

addition to the interest accrued because the ultimate award exceeded both the original award and the amount of interest accrued in the account. Although appellants also argue that the judgment is insufficiently definite to support their right to the original award, we disagree. The judgment recites that the original award, along with interest, should be credited to appellants. We overrule appellants' fourth issue.

**Clarity of the effect of the judgment**

In their fifth, seventh, eighth, ninth, and tenth issues, appellants argue that the judgment is not sufficiently definite or clear regarding the basis for the grant of the directed verdict, the causes adjudicated, and the judgment's effect on future litigation. Specifically, they argue that the judgment should be reversed because it does not recite the grounds for granting the directed verdict and also fails to reflect that this case did not involve: (1) a determination or attempt to determine title or boundary issues regarding a dispute regarding ownership of a strip of property not included in the judgment, or (2) a determination of damages to which appellants are entitled by the State's taking of a portion of the strip or for injury to appellants' remainder property resulting from that taking.

A judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it should provide a definite means of ascertaining such rights, so that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated. *Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994); *Steed v. State*, 183 S.W.2d 458, 460 (Tex. 1944). The trial court's judgment is definite for appellate purposes when it

neither conditions nor clouds with uncertainty the rights and obligations it establishes. *See Hinde v. Hinde*, 701 S.W.2d 637, 639 (Tex. 1985).

The judgment in this case regarding the amount held in the registry is sufficiently definite and certain because, in awarding a total of $213,423, it acknowledges that $38,702 constitutes full payment for the easement and $174,721 represents the other damage award. It notes the amount held in the registry at the time ($52,229.04), then credits that amount from the total it orders the State to pay (total of damages and prejudgment interest, less credit for Clerk's interest deposit equals total due from Condemnor).

Moreover, we conclude that the judgment is sufficiently definite and certain to define and protect the rights of all litigants regarding other disputes. The judgment states, among other things, that it "was stipulated, both in writing and in open court, that the State of Texas, Condemnor, had the right to condemn and take *the property sought in the above entitled cause and described in Condemnor's Statement in Condemnation and as follows*"—with a lengthy legal description of the metes and bounds of the real property at issue. (Emphasis added.) A judgment is not required to include all possible arguments that appellants could have or did make, or whether res judicata may apply in other lawsuits. It is only required to be sufficiently definite and certain to define and protect the rights of the litigants, or it should provide a definite means of ascertaining such rights, to the end that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated. *Stewart*, 870 S.W.2d at 20; *Steed*, 183 S.W.2d at 460. On its face, the judgment here describes the property for which compensation was awarded.

Additionally, the judgment recites that

> at trial on the cause, Condemnees asserted Second Amended Objections to the Award of the Special Commissioners and Crossclaims and presented evidence thereof, and rested and closed. *Condemnor then moved for a directed verdict on all such Crossclaims, which Motion for Directed Verdict was sustained.*

(Emphasis added.) The judgment is clear that the motion for directed verdict on all the crossclaims was sustained. The reporter's record contains a lengthy discussion regarding the grounds for the motion. The judgment itself is not required to articulate the grounds for the motion or the court's decision in order to be sufficiently definite or certain. *See Democracy Coalition v. City of Austin*, 141 S.W.3d 282, 288-89 (Tex. App.—Austin 2004, no pet.) (even if reason given by court is erroneous, granting of directed verdict can be affirmed if another ground exists to support it). We overrule appellants' fifth, seventh, eighth, ninth, and tenth issues.

Appellants also challenge, in their sixth issue, that the judgment is void because it includes a statement ordering "that Condemnor have Judgment upon Condemnees' Second Amended Objections to the Award of the Special Commissioners and Crossclaims." They argue that, "taken literally, [the language] would indicate that the court rendered a take nothing judgment against the Hopkins, [sic] which conflicts with other language in the judgment granting relief" to them. This argument takes one sentence of the judgment wholly out of context and presents the argument in a vacuum. The statement refers to the fact that the court was basing its judgment on relief requested in appellants' second amended objections, not that it was ordering a take nothing judgment. Furthermore, we note that the State has already tendered the amount ordered in the judgment to the registry of the court. Thus, it is not arguing that a take-nothing judgment was entered.

18

We hold that the judgment is sufficiently definite and certain to define and protect the rights of the litigants and that it provides a definite means of ascertaining such rights, to the end that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated. *See Stewart*, 870 S.W.2d at 20; *Steed*, 183 S.W.2d at 460. We overrule appellants' sixth issue.

**Jury charge**

Appellants state in their brief that they have filed a trespass to try title suit against Janoe Truck Sales and Service, Inc. related to a 0.461 acre strip of land adjacent to appellants' property at issue in this case. The State took a 0.313 acre easement from that 0.461 acre strip as part of the same drainage modifications to IH-35. In their eighteenth issue, appellants assert that the trial court erred by refusing to instruct the jury that they were the owners of that strip, and therefore the jury should have been instructed that the total area of land they owned was 8.271 acres rather than the 7.81 acres actually submitted to the jury.

We review a trial court's decision to submit or refuse a particular instruction under an abuse-of-discretion standard of review. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The trial court has considerable discretion to determine necessary and proper jury instructions. *Id*.

Question two of the jury charge asks the jury "What was the decrease, if any, in "Fair Market Value" of the remainder of the 7.81 acres of the Condemnees' land, immediately after the taking on August 21, 1991, taking into consideration the effect of the condemnation on the value of the remaining property." The question is followed by an instruction that "The 'Effect of the Condemnation' means the acquisition of the 0.242 acre easement from the whole property and the

19

uses to which it was put." At the jury charge conference, appellants "requested that the jury be instructed that the size of the whole property is 8.271 acres. The landowners are entitled to be compensated in this case for the damages to the entirety of their property. The whole property consists of 8.271 acres. That's supported by the evidence." The court denied the requested instruction.

Appellants' experts testified that they performed two different damage calculations; one based on an assumption that the property consisted of 8.271 acres, and the other that the whole property was 7.81 acres. However, at one point during the direct examination of expert Schwethelm, appellants' attorney stated

> Q: Okay. Now, when you were asked questions earlier about the size of the easement, .242 of an acre was taken from Hopkins, and .313 of an acre was taken from Jano[e]—do you recall that testimony?
>
> A: Yes.
>
> Q: You understand that a portion of the land that was taken, the easement, that was taken from Jano[e], is claimed by Hopkins?
>
> A: I understand that, and that is not a part of this case.
>
> Q: That's right.

Appellants' attorney then passed the witness. Thus, appellants stated, in front of the jury and to the court, that ownership of the strip was not at issue in the case. Additionally, the Statement in Condemnation contains a legal description of the property, describing it in metes and bounds, and states that the drainage easement sought consists of 0.242 acres, which does not take into account the 0.313 acre easement relating to the Janoe property, even if appellants assert ownership of the

20

strip. The court heard testimony regarding compensation for the 0.242 acre easement. Based on the record before us, we hold that the trial court did not abuse its discretion in refusing to instruct the jury that the whole property owned by appellants consisted of 8.271 acres. We overrule appellants' eighteenth issue.

**Directed verdict**

In their sixteenth and seventeenth issues, appellants challenge the trial court's grant of a directed verdict regarding their allegations of common-law nuisance, nuisance per se, and violation of section 11.086 of the water code.[11] *See* Tex. Water Code Ann. § 11.086. Relatedly, in their eleventh and twelfth issues, appellants contend that the judgment fails to "make clear" or recite that it does not affect their right to recover damages under the water code or based on a nuisance claim.

A directed verdict in favor of a defendant is proper if (1) there is no evidence of probative value to raise an issue of material fact on the question presented, *see Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004), or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). We examine the evidence in the light most favorable to the party suffering the adverse judgment, *see Crane Carrier Co.*, 140 S.W.3d at 684, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823-27 (Tex.

---

[11] Appellants withdrew their claims for mental anguish and exemplary damages at the end of their case before the court addressed the State's motion for directed verdict.

2005).  We give the losing party the benefit of all reasonable inferences created by the evidence.  *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983)).  If there is any conflicting evidence of probative value on any theory of recovery, an instructed verdict is improper and the case must be reversed and remanded for jury determination of that issue.  *Szczepanik*, 883 S.W.2d at 649; *White*, 651 S.W.2d at 262.  Furthermore, even if the reason given by the trial court is erroneous, the granting of a directed verdict can be affirmed if another ground exists to support it.  *Democracy Coalition*, 141 S.W.3d at 288-89.

### *Claims regarding the violation of section 11.086 and nuisance per se*

First, in appellants' eleventh, twelfth, and sixteenth issues, they specifically challenge the trial court's resolution of their claim under the water code.  Appellants' causes of action for nuisance and nuisance per se arise from the same facts as their claim that the State violated section 11.086.  *See* Tex. Water Code Ann. § 11.086.  In their Second Amended Objections, appellants claimed that the State unlawfully

> concentrated the flow of surface water runoff north and east of [the] property and diverted such flow to a point at the northeast end of [the] property.  By constructing diverting structures without retention capacity, enlarging the drainage capacity of its culvert system, and lowering the grade of the drainage structures, the IH 35 and Slaughter Lane underpass, and the land taken from [appellants], [the State] increased the volume, magnitude, and rate of storm water runoff, and diverted onto [appellants'] property water which would not have reached such property but for its diversion by [the State's] alteration of the natural drainage in the area.

Section 11.086, entitled "Overflow Caused by Diversion of Water," provides, in relevant part, that

(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

. . . .

(c) The prohibition of Subsection (a) of this section does not in any way affect the construction and maintenance of levees and other improvements to control floods, overflows, and freshets in rivers, creeks, and streams or the construction of canals for conveying water for irrigation or other purposes authorized by this code.

*Id.* A cause of action under section 11.086(a) requires proof of (1) a diversion or impoundment of surface water that (2) causes (3) damage to the property of the landowner. *Kraft v. Langford*, 565 S.W.2d 223, 229 (Tex. 1978). "Surface water" has been judicially defined as "that which is defused over the ground from falling rains or melting snows, and continues to be such until it reaches some bed or channel in which water is accustomed to flow." *Dalon v. DeSoto*, 852 S.W.2d 530, 538-39 (Tex. App.—Dallas 1992, writ denied) (citing *City of Princeton v. Abbott*, 792 S.W.2d 161, 163 (Tex. App.—Dallas 1990, writ denied) (quoting *Stoner v. City of Dallas*, 392 S.W.2d 910, 912 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.))); *see Dietrich v. Goodman*, 123 S.W.3d 413, 418 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (defining surface water as "water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches a bed or channels in which it is accustomed to flow"); *Raburn v. KJI Bluechip Invs.*, 50 S.W.3d 699, 704 (Tex. App.—Fort Worth 2001, no pet.); *see also Mitchell v. Blomdahl*, 730 S.W.2d 791, 792-93 (Tex. App.—Austin 1987, writ ref'd n.r.e.). Surface waters do not follow a defined course or channel and do not gather into or form a natural body of water. *Dalon*, 852 S.W.2d at 538-39.

23

When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water. *Id*. at 538. The chief characteristic of surface water is its inability to maintain its identity and existence as a body of water, distinguishing it from water flowing in a natural watercourse. *Id*. "If the floodwater forms a continuous body with the water flowing in the ordinary channel, or if it temporarily overflows presently to return, as by recession of the waters, it is to be regarded as still a part of the stream." *Id*. at 538-39. Moreover, the prohibition against diverting or impounding surface waters "does not in any way affect the construction and maintenance of . . . improvements to control floods . . . ." Tex. Water Code Ann. § 11.086.

The judgment does not specify the basis for the court's decision. However, at trial, the parties disputed whether "surface waters" had been diverted, and if they had, whether subsection (c) of section 11.086 applied to bar appellants' cause of action. In their brief, appellants assume that the State has actually diverted surface waters and limit their argument to the question of whether the court properly held that subsection (c) of section 11.086 "trumps" subsection (a). Specifically, appellants contend that there is no evidence that the improvements were made for the purpose of controlling floods. Instead, they argue that the evidence shows that the improvements were part of highway modifications.

First, we consider the threshold issue of whether there is evidence that "surface water" was diverted. David Bolton, a certified real estate appraiser, testified that there was a creek on appellants' property that held water when it rained, but was normally a dry creek. He opined that the water in the creek came from both direct rainwater and from rainwater running across the highway. Mark Taylor, a civil engineer, testified that, after the improvements were made,

24

A: the Reader's Digest version is that we shortened the time of concentration, which increased the discharge. It's not more physical volume of water. It just got there faster because the structure more efficiently moved the water, and that gives you a higher crest. And we calculated that to be—by comparison, the before discharge was 1,048, and, after, we calculated 1,521 [cubic feet per second].

Q: But is there anything about the creation of the structures or the new creation, the improvements done in '88 or '90, that causes more water to go onto the Hopkins property?

A: No. Water is not created. In a rainfall event, it's the same total volume of rainfall that hits within the 200 acres. How it conveys from within the watershed to the point that's under study will vary, depending on the time of concentration.

. . .

Q: Would you describe the physical characteristics of the easement taken, the 0.242 acres easement?

A: It's just a channel, a ditch.

Q: And then the area downstream from it, if you would, describe it as well.

A: It's all—it's a channel that's fairly defined for the first eight feet or so of depth.

Q: Are there any permanent type structures on that easement? I'm talking about newly constructed box culverts on the northbound frontage road [of the Hopkins property].

A: No, nothing permanent in there. That easement was for shaping and draining the new elevations of the ground at the box culvert grade into the existing channel.

Q: So what was the use of the ditch before the project to catch and reshape or to reshape that 0.242 acres, and what's the use after?

A: Both the same. It's just a drainageway.

A.J. Ghaddar, a registered professional civil engineer, testified that

25

A: the easement was taken to introduce another use of the drainage structure, and we are achieving that use. We are using now a lot bigger, larger. [sic] And that easement is very much attached to the structure, the new structure, the improvement. With that, we brought more flow onto the property, and that more flow has some impact on the property.

Q: Okay. And you just said the more flow has an impact on the property. What are those impacts?

A: The impact is that you're going to lose more land for the flow. . . . When you have more flow in that channel, it's going to rise, the depth of that water. The depth is going to expand and is going to take more land. The other issue will be the environmental issue, erosion. Once you get more water flowing through that channel, you're going to have also more velocity, faster velocity. The depth of the water, once it increases the velocity—the mean velocity will increase, and consequently it's going to erode more material and dirt out of the channel. So it has the impact of land space or area, and then erosion to the channel and the channel banks.

On cross-examination, Ghaddar was asked whether appellants' property currently had a river that carried water. He responded that there was not, but that "It's—the channel, the way it is now with the season, or whenever it rains and runoff from the adjacent property drains into it and carries it down to Onion Creek, so it's really a subsidiary of Onion Creek, but it's not a continuous flowing stream." Ghaddar also admitted that when it rained there is an existing body of water that's going under and onto appellants' property.

When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water. *Dalon*, 852 S.W.2d at 538-39. The chief characteristic of surface water is its inability to maintain its identity and existence as a body of water, distinguishing it from water flowing in a natural watercourse. *Id*. "If the floodwater forms a continuous body with the water flowing in the ordinary channel, or if it temporarily overflows presently to return, as by recession of

26

the waters, it is to be regarded as still a part of the stream." *Id*. at 538-39. In this case, the evidence shows that a ditch was on appellants' property, and although it was often dry, the actual volume of water was not increased by the State's improvements to IH-35. The expert testimony establishes that surface water was not involved because the potential floodwater flowing onto the property was able to maintain its identity and existence as a body of water on the property, *see id*., and in any event, when it rains, the same total volume of rainfall hits within the 200 acres. We hold that the trial court did not err by granting a directed verdict as to section 11.086 of the water code and cause of action for nuisance per se because the evidence did not establish that "surface water" was diverted onto appellants' property.

Furthermore, even if "surface waters" were diverted, there was evidence that the improvements were constructed in order to control floods and overflows. *See* Tex. Water Code Ann. § 11.086(c). Thus, the prohibition of subsection (a) does not apply. *See id*. Appellants argue that there was no evidence that the sole purpose of modifying IH-35 was in order to control floods, and therefore, subsection (c) does not apply under these circumstances. We disagree. There was expert testimony that some of the modifications/improvements to IH-35 were made in order to facilitate the flow of rainwater off the highway. The plain language of the statute does not require the underlying roadway construction in this case to have the sole purpose of controlling floods, but that the *construction and maintenance of improvements* was made in order to control floods and overflows. *See id*. Thus, evidence that the improvements in the drainage waterway and modifications to box culverts were intended to control floods and overflow is sufficient to invoke subsection (c)—barring

27

liability under subsection (a) of section 11.086 in the event surface waters were diverted. *See id*. We overrule appellants' eleventh, twelfth, and sixteenth issues.

### *Nuisance claims*

Next, in appellants' seventeenth issue, they contend that the trial court erred by granting a directed verdict on their nuisance claim, and by failing to recite in the judgment that they are not precluded from pursuing the claim in the future. They state that their nuisance claim is based on the same facts as their claim alleging violation of section 11.086—the State's diversion of surface waters "and the unleashing of those waters" onto their property, which interfered with their use and enjoyment of the property.[12]

A person whose property is injured by an overflow of water caused by an *unlawful* diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow. *Id*. § 11.086(b) (emphasis added). Because we have found that the State's improvements did not constitute an unlawful diversion or impounding of surface water, we hold that the trial court did not err by granting a directed verdict in favor of the State on appellants' nuisance claim. We overrule appellants' seventeenth issue.

## Res judicata and collateral estoppel

Moreover, in their thirteenth, fourteenth, and fifteenth issues, appellants essentially argue that the judgment should address whether the doctrines of res judicata and collateral estoppel apply to bar their recovery in other lawsuits that are currently pending.

---

[12] The State does not respond to the nuisance claim in its brief.

28

The doctrines of res judicata and collateral estoppel both serve the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *John G. and Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288-89 (Tex. 2002). A judgment is not required to state whether appellants are precluded from pursuing these claims in the future or whether the principles of res judicata or collateral estoppel might apply to bar them. *See Stewart*, 870 S.W.2d at 20 (judgment must be sufficiently definite and certain to define and protect rights of all litigants, or provide definite means of ascertaining such rights, so that ministerial officers can carry judgment into execution without ascertainment of facts not therein stated). It would be improper for the judgment in this case to include a finding that claims in other litigation are barred by res judicata and collateral estoppel because such finding would be dependent upon the substance of those claims in the other suits, the records of which are not addressed in the record before us. *See id.*; *Dewhurst*, 90 S.W.3d at 288-89. We overrule appellants' thirteenth, fourteenth, and fifteenth issues.

**Motion to disqualify**

Jean Hopkins and the State filed a motion in this Court to disqualify Mark Hopkins, a son of Jean and James, as appellants' attorney in this case. They allege that Mark has violated multiple disciplinary rules, which has resulted in actual prejudice to them because the case has been pending in the court system since 1991 without a final resolution or settlement. We abated the determination of the motion and this case, stating that until the question of Jean's interest in this cause was resolved in related divorce litigation, *see Hopkins v. Hopkins*, 03-03-00629-CV, we would consider Jean and the State to have aligned interests. In the above cause, we determined that Jean

29

has assigned her interest in this case to James. Therefore James properly appears in this cause representing her interest.[13] However, because the State joined Jean's motion, we will discuss the merits of the motion.

"Disqualification is a severe remedy" that can cause immediate and palpable harm by depriving the party of its chosen counsel and disrupting court proceedings. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (citing *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) and quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990)). In considering a motion to disqualify, the court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory trial tactic. *In re Cerberus Capital Mgmt.*, 164 S.W.3d at 382 (citing *Spears*, 797 S.W.2d at 656). Disciplinary rules are merely guidelines—not controlling standards—for disqualification motions. *In re Meador*, 968 S.W.2d 346,

---

[13] Furthermore, Jean has the right to discharge Mark at any time. *See In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 335 (Tex. 1999) (client can discharge attorney at any time, with or without cause). Under these circumstances, Jean has failed to prove that Mark's representation has caused her actual prejudice. *See In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002). Her attachment of a "Revocation of Power of Attorney and Assignment of Interest in Causes of Action," drafted in the form of an affidavit, does not advance her contentions. First, the document summarily concludes that despite the existence of a mediated settlement agreement [MSA] and partition and exchange agreement [PEA], James Hopkins "has no authority or right to act for me in any respect" and that she intended to "further revoke and rescind any Assignment of Interest in the causes of action described herein." *See* Tex. Fam. Code Ann. §§ 4.102, 6.602 (West Supp. 2005). However, as discussed in *Hopkins v. Hopkins*, 03-03-00629-CV, the MSA and PEA were wholly binding and the parties agreed that the MSA, in which Jean sold her interest in this lawsuit to James, was irrevocable. *See id*. Furthermore, because the motion to disqualify was not filed in the trial court, there is no evidence in the record regarding Jean's allegations against Mark.

350 (Tex. 1998). Even if a lawyer violates a disciplinary rule, the party requesting disqualification must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification. *See In re Nitla S.A. de C.V.*, 92 S.W.3d at 422 (citing *In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 336 (Tex. 1999)); *Meador*, 968 S.W.2d at 350; *Ayres v. Canales*, 790 S.W.2d 554, 558 (Tex. 1990).

The State contends that it has suffered actual prejudice because it has been "prevented from settling these issues that have gone on for over a dozen years" and that the continuation of the case has been due to misrepresentations by Mark Hopkins. Even assuming that Mark has violated rules of ethics—an assumption on which we do not opine—the State's bare allegations that he has been the cause of the delay presented in this case and that he has made misrepresentations is not supported by evidence in the record before us. Therefore, we decline to grant the severe remedy of disqualification. We deny the motion to disqualify.

**CONCLUSION**

We affirm the trial court's directed verdict on appellants' claims of nuisance, nuisance per se, and violations of the water code. We have sustained appellants' first and second issues, sustained their third issue in part, overruled the remainder of their issues, and denied the motion to disqualify.

Upon remand, the trial court should (1) determine the proper amount of prejudgment interest to be awarded to appellants on $177,961, at a rate of 10% simple interest, for the time period of August 21, 1991, until May 12, 2003; (2) award costs to appellants; and (3) determine the proper

31

amount of postjudgment interest to be awarded to appellants on $177,961, at a rate of 10% simple

interest, for the time period of May 12, 2003, until August 4, 2003.[14]


_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Remanded in Part

Filed:  April 27, 2006

---

[14] The notice of appeal identifies James Hopkins and Jean Hopkins as appellants in this case. In referring to appellants, we recognize that Jean Hopkins has assigned her interest in this lawsuit to James.