TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-03-00499-CV







James A. Hopkins and Jean C. Hopkins, Appellants



v.



State of Texas, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. GV100300, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 After a jury trial, appellants James A. Hopkins and Jean C. Hopkins were awarded
damages for the condemnation of a drainage easement on their property. In eighteen issues, they
challenge the trial court's directed verdict on certain claims, the amount of prejudgment and
postjudgment interest, denial of costs, and portions of the jury charge and final judgment. We will
affirm in part and reverse and remand in part.


BACKGROUND


 On December 20, 1990, the State of Texas, acting through the Travis County
Attorney's office, filed a Statement in Condemnation for the condemnation of a drainage easement
on property owned by appellants along the frontage road of IH-35 near Slaughter Lane. (1) See Tex.
Prop. Code Ann. § 21.012 (West 2004). The Statement recites that the easement would be used for
"the constructing, replacing, operating, rebuilding, relocating and maintaining a drainage waterway
as part of the improvements to a state highway." After a hearing on July 11, 1991, special
commissioners awarded appellants $35,462 in compensation. See id. § 21.014 (West 2004). 
Appellants timely filed objections to the award. See id. § 21.018 (West 2004). On August 21, the
State filed a notice that it had deposited $35,462 into the registry of the court. See id. § 21.021 (West
2004). That same day, a writ of possession was granted. On October 3, appellants filed a motion
to transfer the money into an interest-bearing account. The court's order granting the request was
signed and approved by the parties.

 On February 16, 2001, almost ten years after the award, appellants filed their First
Amended Objections to the Award of the Special Commissioners. (2) On February 20, the court
granted appellants' motion to transfer the cause to Travis County district court. See id. § 21.002
(West 2004) (county court shall transfer eminent domain case to district court if court determines
that case involves issue of title or other matter that cannot be fully adjudicated in that court). 
Subsequently, trial on the merits was set for early February 2003.

 On January 31, 2003, appellants filed their Second Amended Objections to the Award
of the Special Commissioners and Cross Claims, adding causes of action for nuisance and violations
of the water code. See Tex. Water Code Ann. § 11.086 (West 2000). The State filed a motion to
strike the amended pleadings, arguing that they were prejudicial and constituted unfair surprise
because they raised new and substantive issues only ten days before trial on the merits, and 
approximately eleven and a half years after the original objections to the original award. The State
also argued that the pleadings were in conflict with a stipulation the parties had entered into in May
2000, agreeing that the State had met all legal requirements to take the property, "subject only to the
payment of compensation as required under the applicable provisions of the Property Code."

 The case proceeded to trial before a jury. At the close of appellants' case, the State
moved for a directed verdict on the crossclaims of nuisance and violations of the water code. The
trial court granted the motion. The case was then submitted to the jury, who unanimously found that
"the fair market value of the 0.242 acre easement interest taken on August 21, 1991 by the State of
Texas without any consideration of the condemnation" was $38,702. The jury also unanimously
found that the decrease in fair market value "of the remainder of the 7.81 acres of the [appellants']
land, immediately after the taking on August 21, 1991, taking into consideration the effect of the
condemnation on the value of the remaining property," was $174,721. On May 12, the trial court
entered a final judgment awarding appellants damages and prejudgment interest.

 Appellants filed a "Motion to Modify Judgment; Second Amended Motion to Render
Judgment; and in the alternative, Motion for New Trial." The State made an unconditional tender
to appellants of the entire amount awarded in the judgment, $258,414.54. (3) In a letter dated May 19,
2003, appellants refused to accept payment, and on August 4, the State deposited the award into the
registry "in order to stop any postjudgment interest except as might be earned by the deposit of the
original award in the interest bearing account created by agreement of the parties in 1991."

 Appellants' motion to modify and motion for new trial were overruled by operation
of law, and this appeal ensued. Subsequently, Jean Hopkins filed a motion in this Court notifying
us that she had discharged the Hopkinses' son, Mark A. Hopkins, as her attorney. She also sought
to disqualify him from representing either her or James in this case. The State joined in her motion.

 We will first discuss the merits of the appeal, then determine whether Mark Hopkins
should be disqualified from representing Jean or James in this appeal.


DISCUSSION


Prejudgment interest


 In their first issue, appellants contend that the trial court erred by (1) miscalculating
the rate and term for prejudgment interest and, (2) by finding that the agreed order, which placed the
amount awarded by the special commissioners into an interest bearing account, constituted an
agreement that superceded the statutory rate of prejudgment interest.

 We review the trial court's award of prejudgment interest for an abuse of discretion. 
Wilmer-Hutchins Indep. Sch. Dist. v. Smiley, 97 S.W.3d 702, 706 (Tex. App.--Dallas 2003, pet.
denied). The trial court may abuse its discretion by failing to analyze or apply the law correctly, see
Powell v. Stover, 165 S.W.3d 322, 324 (Tex. 2005), because a court "has no 'discretion' in
determining what the law is or applying the law to the facts." In re Prudential Ins. Co. of Am. &
Four Partners, L.L.C., 148 S.W.3d 124, 135 (Tex. 2004) (quoting Walker v. Packer, 827 S.W.2d
833, 840 (Tex. 1992)).

 Prejudgment interest is "compensation allowed by law as additional damages for lost
use of the money due as damages during the lapse of time between the accrual of the claim and the
date of judgment." Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 528
(Tex. 1998) (quoting Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985)). 
The landowner's entitlement to prejudgment interest in condemnation cases derives from article I,
section 17 of the Texas Constitution. See Tex. Const. art. I, § 17; Whittington v. City of Austin, 174
S.W.3d 889, 906-07 (Tex. App.--Austin 2005, pet. denied) (citing State v. Hale, 146 S.W.2d 731,
738 (Tex. 1941)); City of Houston v. Texan Land & Cattle Co., 138 S.W.3d 382, 388-89 (Tex.
App.--Houston [14th Dist.] 2004, no pet.). In these cases, prejudgment interest is awarded if the
landowner appeals from the special commissioners' award, the condemnor opts to deposit the
amount of the special commissioners' award into the court's registry to gain the right of possession,
and the trial court ultimately awards damages in excess of the special commissioners' award. 
Whittington, 174 S.W.3d at 906-07; see generally Robert H. Pemberton, A Guide to Recent Changes
and New Challenges in Texas Prejudgment Interest Law, 30 Tex. Tech L. Rev. 71, 118 (1999). The
longstanding rule has been that prejudgment interest begins to accrue on the date of the constitutional
taking--the date the condemnor pays the amount of the special commissioners' award into the
court's registry and gains the right to possess the property. Whittington, 174 S.W.3d at 907; see
Hale, 146 S.W.2d at 738; Texan Land & Cattle Co., 138 S.W.3d at 389; City of Austin v. Foster, 623
S.W.2d 672, 674-75 (Tex. Civ. App.--Austin 1981, writ ref'd n.r.e.). The landowner does not
receive prejudgment interest on the amount of the deposit, as he or she has the right to use those
funds, but only on any additional amount awarded by the trial court, which, in concept, represents
funds the landowner was wrongfully deprived of prior to judgment. Whittington, 174 S.W.3d at 907;
see Housing Auth. of Dallas v. Shambry, 252 S.W.2d 963, 966 (Tex. Civ. App.--Austin 1952, writ
ref'd n.r.e.) ("in [condemnation] cases where the amount of damages is the only issue, the deposit
is the equivalent of a tender and prevents the running of interest to the extent of the amount of the
deposit.").

 Here, in conformance with the jury verdict, the trial court awarded damages of
$38,702 for the easement and $174,721 for damages to the remainder of the property, totaling
$213,423. The State had deposited $35,462 into the registry of the court following the
commissioner's award in 1991; prejudgment interest is not owed on that amount. See Hale, 146
S.W.2d at 738; Whittington, 174 S.W.3d at 907. However, prejudgment interest is owed on
$177,961: the amount of damages ultimately awarded in excess of the special commissioners'
award. See Whittington, 174 S.W.3d at 907; see also Shambry, 252 S.W.2d at 966.


 Entitlement to prejudgment interest


 As an initial matter, the State argues that prejudgment interest should not be awarded
because there was no "actual physical possession" and therefore appellants were never deprived of
the use of the land. This argument fails because the State took actual possession of the easement
when the court granted its request for a writ of possession after the deposit was made in August
1991. Appellants are entitled to an award of prejudgment interest, but we must consider the proper
rate and term of the interest on $177,961--the amount ultimately awarded in excess of the special
commissioners' award.


 Statutory rate versus actual accrual rate


 Appellants contend that the award of prejudgment interest should have been
calculated at the statutory rate of 10 percent. See Tex. Fin. Code Ann. § 304.201(2) (West Supp.
2005). Generally, the prejudgment interest rate in a condemnation case is equal to the postjudgment
interest rate at the time of judgment and is computed as simple interest. (4) Id. However, the State
argues that appellants are not entitled to prejudgment interest at the statutory rate because of the
parties' motion and corresponding agreed order which transferred the original deposit of the award
from the registry of the court into an interest bearing account held by the court. According to the
State, the motion and agreement had the legal effect of limiting appellants' recovery of prejudgment
interest on the excess amount of damages--which had not yet been awarded--to the rate actually
accrued by the account, an average annual rate of 4.5974%, instead of the statutory rate of 10%. See
id. The State also argues that because the parties' May 2000 agreement does not expressly mention
prejudgment interest, appellants are barred from recovering it. (5)

 In the final judgment, the court recited that the motion to deposit the initial payment
into an interest bearing account constituted


an agreement that superceded the entitlement to prejudgment interest on the award
and that the actual rate of interest earned thereon is a fair rate for calculation of
interest on the additional compensation determined by the jury. Interest earnings on
such deposit has been variable through the years at an effective annual rate of
4.5974%, with a balance of the original award and interest accumulations as of
March 31, 2003 of $52,229.04.


Accordingly, the court calculates prejudgment interest due and owing as follows:


1. $38,702 @ 4.5974% = $1,779.28/yr. for 11.75 years = $20,906.54

 

 Total $38,702 + $20,906.54 = $59,608.54


2. $174,721 @ 4.5974% = $669.385/mo. calculated from October 1, 2000 (the date
the counterclaim for damages to the remainder was filed) for 33 months =
$22,089.70

 

 Total $174,721 + $22,089.70 = $196,810.70


3. Total of damages and prejudgment interest: $59,608.54 + $196,810.70 

 = $258,418.54

4. Less credit for Clerk's interest deposit: - 52,229.04

5. Total due from Condemnor: $206,189.50

 We conclude that the May 2000 agreement cannot be fairly read to waive appellants'
possible claim of prejudgment interest on future damages in excess of the special commissioners'
original award. First, it does not state that appellants were waiving their right to an award of
prejudgment interest. Furthermore, at the time the agreement was made, appellants were not entitled
to prejudgment interest because they had not yet been awarded an amount exceeding the amount
awarded by the special commissioners. See Whittington, 174 S.W.3d at 907; see also Shambry, 252
S.W.2d at 966. Instead of waiving their right to interest, the record suggests that the parties were
stipulating that the State had the right to condemn the property, an issue that appellants had 
previously challenged.

 Moreover, appellants' motion to transfer funds from the registry into an interest
bearing account, and the corresponding agreed order, did not explicitly or implicitly waive their
future right to recover the statutory rate of prejudgment interest on any excess amount that might be
awarded. Appellants' right to prejudgment interest at the statutory rate is derived from the
constitution, a claim that was not waived by the language of the agreements. See Tex. Const. art.
I, § 17. For all of these reasons, we hold that the trial court erred in awarding prejudgment interest
at the actual average annual accrual rate of 4.5974%. Appellants were entitled to the statutory rate
of 10% prejudgment interest on $177,961--the amount ultimately awarded in excess of the special
commissioners' award. See Tex. Fin. Code Ann. § 304.201(2).


 Accrual date of prejudgment interest on crossclaim


 Next, appellants argue that the court erred by limiting the term of prejudgment interest
awarded on the remainder damages. The court based its award on the filing date of the crossclaim
instead of the actual date of damage. Appellants assert that the term should be based on either (1)
the 4,519 days between the date the original petition was filed and the date of judgment, or (2) the
4,282 days between the deposit of the award into the registry and the date of judgment.

 The Texas Constitution provides that no person's property shall be damaged or
applied to public use without adequate compensation being made. See Tex. Const. art. I, § 17. 
Therefore, the State's obligation to pay compensation in the form of interest begins when the damage
is inflicted to the property. City of Sweetwater v. McEntyre, 232 S.W.2d 434, 437-38 (Tex. Civ.
App.--Eastland 1950, writ ref'd n.r.e.); see Hale, 146 S.W.2d at 737-38. Damage is inflicted as of
the date of the constitutional taking--in this case, the date the State deposited the amount of the
special commissioners' award into the court's registry and gained the right of possession. 
Whittington, 174 S.W.3d at 907; see Hale, 146 S.W.2d at 738; Texan Land & Cattle Co., 138
S.W.3d at 389; see also Tex. Prop. Code Ann. § 21.021. Thus, notwithstanding the fact that the
crossclaim was not filed until October 2000, we hold that prejudgment interest should have been
awarded at the statutory rate for the time period of August 21, 1991, until the date of the judgment,
May 12, 2003. (6)

 Because the court abused its discretion by miscalculating both the rate and accrual
date of prejudgment interest, we sustain appellants' first issue.

Recovery of costs


 In their second issue, appellants argue that the trial court erred by failing to award
costs in their favor.

 Subsection (a) of section 21.047 of the property code provides as follows:



Special commissioners may adjudge the costs of an eminent domain proceeding
against any party. If the commissioners award greater damages than the condemnor
offered to pay before the proceedings began or if the decision of the commissioners
is appealed and a court awards greater damages than the commissioners awarded, the
condemnor shall pay all costs. If the commissioners' award or the court's
determination of the damages is less than or equal to the amount the condemnor
offered before proceedings began, the property owner shall pay the costs.



Tex. Prop. Code Ann. § 21.047(a) (West 2000). After the special commissioners have assessed
damages, they shall make and sign a written statement of the accrued costs of the proceeding, naming
the party against whom the costs are adjudged, and file the statement with the court. Id. § 21.048
(West 2000).

 The purpose of section 21.047(a) is to encourage the condemnor to offer the true
value of the land and to discourage the property owner from making extravagant demands in their
attempt to agree through negotiations preceding the filing of statutory proceedings. State v. Schmidt,
894 S.W.2d 543, 545 (Tex. App.--Austin 1995), overruled on other grounds by Hubenak v. San
Jacinto Gas Transmission Co., 141 S.W.3d 172 (Tex. 2004). The amount of damages finally
recovered by the property owner determines the issue of adjudging costs. Schmidt, 894 S.W.2d at
545; see Tex. Prop. Code Ann. § 21.047. If the property owner ultimately recovers more than the
condemnor's offer, whether by the administrative award of the special commissioners or the
judgment of the trial court, then "the condemnor shall pay all costs." Schmidt, 894 S.W.2d at 545
(quoting Tex. Prop. Code Ann. § 21.047). However, if the award of the commissioners or the trial
court, whichever is final, is equal to or less than the amount of the condemnor's offer, "the property
owner shall pay the costs." Id.

 The State offered appellants $35,475 as compensation for the easement. (7) The final
judgment awards appellants $38,702 for the easement and $174,721 for damages to the remainder
of the property.

 The State argues that fees for attorneys, experts, and other expenses are incidental
expenses which are not recoverable, citing City of Houston v. Biggers, 380 S.W.2d 700, 705 (Tex.
App.--Houston [1st Dist.] 1964, writ ref'd n.r.e.). However, Biggers does not discuss section
21.047 and is distinguishable. In Biggers, the court held that the landowners were not entitled to
recover their expenses when their property was not ultimately taken. See id. at 704-05 (passage of
ordinance including land in what was contemplated as civic center did not constitute taking; act was
purely legislative and could be changed at any time). In this case, however, an actual taking occurred
that was compensatory with damages that exceeded the offer by the State.

 There is no dispute that appellants were ultimately awarded damages that exceeded
the State's offer. Therefore, the State is required to pay appellants' costs. (8) See Tex. Prop. Code
Ann. § 21.047. We sustain appellants' second issue.

Postjudgment interest


 In their third issue, appellants contend that the trial court erred by failing to award
them postjudgment interest. The State argues that "[w]hile [appellants] may be entitled to
postjudgment interest in theory," it is not reversible error in this case because (1) the agreements do
not provide for postjudgment interest; and (2) appellants refused to accept payment of the judgment.

 A money judgment of a court in this state must specify the postjudgment interest rate
applicable to that judgment. Tex. Fin. Code Ann. § 304.001 (West Supp. 2005). Furthermore, a
money judgment of a court of this state to which section 304.002 of the finance code does not apply, (9)
including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment
interest at the rate determined under section 304.003 of the finance code. Id. § 304.003 (West
1998). (10) Postjudgment interest begins to accrue on the date the judgment is rendered and ends on
the date the judgment is satisfied. See id. § 304.005(a) (West Supp. 2005).

 Furthermore, it is a longstanding principle that "a litigant cannot treat a judgment as
both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot
afterward prosecute an appeal therefrom." Texas State Bank v. Amaro, 87 S.W.3d 538, 544 (Tex.
2002) (quoting Carle v. Carle, 234 S.W.2d 1002, 1004 (Tex. 1950)). However, there is a narrow
exception to this rule: if an appellant "accepts only that which an appellee concedes, or is bound to
concede, to be due him under the judgment he is not estopped to prosecute an appeal which involves
only his right to a further recovery." Id. (quoting Carle, 234 S.W.2d at 1004). An appeal may be
taken where the reversal of the judgment challenged cannot possibly affect appellants' right to the
benefit accepted. Carle, 234 S.W.2d at 1004; Bloom v. Bloom, 935 S.W.2d 942, 947 (Tex.
App.--San Antonio 1996, no writ).

 Postjudgment interest is not a punishment inflicted on a judgment debtor for
exercising the right to appeal. Miga v. Jensen, 96 S.W.3d 207, 212 (Tex. 2002). Instead, like
prejudgment interest, postjudgment interest is simply compensation for a judgment creditor's lost
opportunity to invest the money awarded as damages at trial. Id. (citing Johnson & Higgins of Tex.,
Inc., 962 S.W.2d at 528). When a judgment creditor has received an unconditional tender of the
money awarded, and may invest it as he chooses, there is no need for the continuing accrual of
postjudgment interest. See id. (citing Tex. Fin. Code Ann. § 304.005(a) (West Supp. 2005)). This
is true whether or not an appeal of the underlying judgment is ongoing. See id. (citing Tex. Fin.
Code Ann. § 304.005(b)).

 For the same reasons that the agreements did not bar appellants' recovery of the
statutory rate of prejudgment interest, the agreements likewise do not bar recovery of postjudgment
interest. Furthermore, appellants' appeal falls under the narrow exception expressed in Carle. See
234 S.W.2d at 1004. Because they are seeking additional money in the appeal, and the State did not 
appeal the judgment, only appellants' right to a further recovery is affected. See Amaro, 87 S.W.3d
at 544; Carle, 234 S.W.2d at 1004. Therefore, the "acceptance of benefit" doctrine did not prevent
appellants from withdrawing the money out of the registry of the court. Under these facts, appellants
received an unconditional tender of the money awarded and could have invested it as they chose. 
See Miga, 96 S.W.3d at 212. Thus, there is "no need for the continuing accrual of postjudgment
interest" when the State did not file an appeal and appellants could have withdrawn the unconditional
tender at any time.

 We hold that, under the facts in this case, the State's unconditional tender terminated
the accrual of postjudgment interest upon the deposit of the judgment into the registry. See id. 
Therefore, appellants were entitled to postjudgment interest from the date of the judgment, May 12,
2003, until payment of the judgment was unconditionally tendered on August 4, 2003. We sustain
appellants' third issue in part and overrule it in part.


Clarity of the judgment regarding amount held in the registry


 In their fourth issue, appellants assert that the judgment does not clearly award them
the $35,462 held in the registry of the court along with the interest that accrued while in the interest-bearing account. They acknowledge that the State "does not contest [their] right to receive the award
deposit (and the interest on such deposit), as indicated by its motion for judgment," but argue that
regardless of the State's agreement, "the judgment itself must clearly grant this relief."

 The State took possession of the condemned property after it deposited the amount
of the special commissioners' award into the registry of the court. See Tex. Prop. Code Ann.
§ 21.021(a)(2). When it deposited the money, the parties agreed to transfer the money into an
interest bearing account. Under these circumstances, "[t]he court shall pay the interest that accrues
from the deposit or investment to the condemnor." Id. § 21.021(d). Thus, the court was not required
to award the interest to appellants. The trial court awarded appellants the underlying amount in
addition to the interest accrued because the ultimate award exceeded both the original award and the
amount of interest accrued in the account. Although appellants also argue that the judgment is
insufficiently definite to support their right to the original award, we disagree. The judgment recites
that the original award, along with interest, should be credited to appellants. We overrule appellants'
fourth issue.


Clarity of the effect of the judgment


 In their fifth, seventh, eighth, ninth, and tenth issues, appellants argue that the
judgment is not sufficiently definite or clear regarding the basis for the grant of the directed verdict,
the causes adjudicated, and the judgment's effect on future litigation. Specifically, they argue that
the judgment should be reversed because it does not recite the grounds for granting the directed
verdict and also fails to reflect that this case did not involve: (1) a determination or attempt to
determine title or boundary issues regarding a dispute regarding ownership of a strip of property not
included in the judgment, or (2) a determination of damages to which appellants are entitled by the
State's taking of a portion of the strip or for injury to appellants' remainder property resulting from
that taking.

 A judgment must be sufficiently definite and certain to define and protect the rights
of all litigants, or it should provide a definite means of ascertaining such rights, so that ministerial
officers can carry the judgment into execution without ascertainment of facts not therein stated. 
Stewart v. USA Custom Paint & Body Shop, Inc., 870 S.W.2d 18, 20 (Tex. 1994); Steed v. State, 183
S.W.2d 458, 460 (Tex. 1944). The trial court's judgment is definite for appellate purposes when it
neither conditions nor clouds with uncertainty the rights and obligations it establishes. See Hinde
v. Hinde, 701 S.W.2d 637, 639 (Tex. 1985).

 The judgment in this case regarding the amount held in the registry is sufficiently
definite and certain because, in awarding a total of $213,423, it acknowledges that $38,702
constitutes full payment for the easement and $174,721 represents the other damage award. It notes
the amount held in the registry at the time ($52,229.04), then credits that amount from the total it
orders the State to pay (total of damages and prejudgment interest, less credit for Clerk's interest
deposit equals total due from Condemnor).

 Moreover, we conclude that the judgment is sufficiently definite and certain to define
and protect the rights of all litigants regarding other disputes. The judgment states, among other
things, that it "was stipulated, both in writing and in open court, that the State of Texas, Condemnor,
had the right to condemn and take the property sought in the above entitled cause and described in
Condemnor's Statement in Condemnation and as follows"--with a lengthy legal description of the
metes and bounds of the real property at issue. (Emphasis added.) A judgment is not required to
include all possible arguments that appellants could have or did make, or whether res judicata may
apply in other lawsuits. It is only required to be sufficiently definite and certain to define and protect
the rights of the litigants, or it should provide a definite means of ascertaining such rights, to the end
that ministerial officers can carry the judgment into execution without ascertainment of facts not
therein stated. Stewart, 870 S.W.2d at 20; Steed, 183 S.W.2d at 460. On its face, the judgment here
describes the property for which compensation was awarded.

 

 Additionally, the judgment recites that



at trial on the cause, Condemnees asserted Second Amended Objections to the Award
of the Special Commissioners and Crossclaims and presented evidence thereof, and
rested and closed. Condemnor then moved for a directed verdict on all such
Crossclaims, which Motion for Directed Verdict was sustained.



(Emphasis added.) The judgment is clear that the motion for directed verdict on all the crossclaims
was sustained. The reporter's record contains a lengthy discussion regarding the grounds for the
motion. The judgment itself is not required to articulate the grounds for the motion or the court's
decision in order to be sufficiently definite or certain. See Democracy Coalition v. City of Austin,
141 S.W.3d 282, 288-89 (Tex. App.--Austin 2004, no pet.) (even if reason given by court is
erroneous, granting of directed verdict can be affirmed if another ground exists to support it). We
overrule appellants' fifth, seventh, eighth, ninth, and tenth issues.

 Appellants also challenge, in their sixth issue, that the judgment is void because it
includes a statement ordering "that Condemnor have Judgment upon Condemnees' Second Amended
Objections to the Award of the Special Commissioners and Crossclaims." They argue that, "taken
literally, [the language] would indicate that the court rendered a take nothing judgment against the
Hopkins, [sic] which conflicts with other language in the judgment granting relief" to them. This
argument takes one sentence of the judgment wholly out of context and presents the argument in a
vacuum. The statement refers to the fact that the court was basing its judgment on relief requested
in appellants' second amended objections, not that it was ordering a take nothing judgment. 
Furthermore, we note that the State has already tendered the amount ordered in the judgment to the
registry of the court. Thus, it is not arguing that a take-nothing judgment was entered.

 We hold that the judgment is sufficiently definite and certain to define and protect
the rights of the litigants and that it provides a definite means of ascertaining such rights, to the end
that ministerial officers can carry the judgment into execution without ascertainment of facts not
therein stated. See Stewart, 870 S.W.2d at 20; Steed, 183 S.W.2d at 460. We overrule appellants'
sixth issue.


Jury charge


 Appellants state in their brief that they have filed a trespass to try title suit against
Janoe Truck Sales and Service, Inc. related to a 0.461 acre strip of land adjacent to appellants'
property at issue in this case. The State took a 0.313 acre easement from that 0.461 acre strip as part
of the same drainage modifications to IH-35. In their eighteenth issue, appellants assert that the trial
court erred by refusing to instruct the jury that they were the owners of that strip, and therefore the
jury should have been instructed that the total area of land they owned was 8.271 acres rather than
the 7.81 acres actually submitted to the jury.

 We review a trial court's decision to submit or refuse a particular instruction under
an abuse-of-discretion standard of review. In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000). The trial
court has considerable discretion to determine necessary and proper jury instructions. Id.

 Question two of the jury charge asks the jury "What was the decrease, if any, in "Fair
Market Value" of the remainder of the 7.81 acres of the Condemnees' land, immediately after the
taking on August 21, 1991, taking into consideration the effect of the condemnation on the value of
the remaining property." The question is followed by an instruction that "The 'Effect of the
Condemnation' means the acquisition of the 0.242 acre easement from the whole property and the
uses to which it was put." At the jury charge conference, appellants "requested that the jury be
instructed that the size of the whole property is 8.271 acres. The landowners are entitled to be
compensated in this case for the damages to the entirety of their property. The whole property
consists of 8.271 acres. That's supported by the evidence." The court denied the requested
instruction.

 Appellants' experts testified that they performed two different damage calculations;
one based on an assumption that the property consisted of 8.271 acres, and the other that the whole
property was 7.81 acres. However, at one point during the direct examination of expert Schwethelm,
appellants' attorney stated


Q: Okay. Now, when you were asked questions earlier about the size of the
easement, .242 of an acre was taken from Hopkins, and .313 of an acre was
taken from Jano[e]--do you recall that testimony?


A: Yes.


Q: You understand that a portion of the land that was taken, the easement, that was
taken from Jano[e], is claimed by Hopkins?


A: I understand that, and that is not a part of this case.


Q: That's right.



Appellants' attorney then passed the witness. Thus, appellants stated, in front of the jury and to the
court, that ownership of the strip was not at issue in the case. Additionally, the Statement in
Condemnation contains a legal description of the property, describing it in metes and bounds, and
states that the drainage easement sought consists of 0.242 acres, which does not take into account
the 0.313 acre easement relating to the Janoe property, even if appellants assert ownership of the
strip. The court heard testimony regarding compensation for the 0.242 acre easement. Based on the
record before us, we hold that the trial court did not abuse its discretion in refusing to instruct the
jury that the whole property owned by appellants consisted of 8.271 acres. We overrule appellants'
eighteenth issue.


Directed verdict


 In their sixteenth and seventeenth issues, appellants challenge the trial court's grant
of a directed verdict regarding their allegations of common-law nuisance, nuisance per se, and
violation of section 11.086 of the water code. (11) See Tex. Water Code Ann. § 11.086. Relatedly, in
their eleventh and twelfth issues, appellants contend that the judgment fails to "make clear" or recite
that it does not affect their right to recover damages under the water code or based on a nuisance
claim.

 A directed verdict in favor of a defendant is proper if (1) there is no evidence of
probative value to raise an issue of material fact on the question presented, see Bostrom Seating, Inc.
v. Crane Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004), or (2) the plaintiff admits or the evidence
conclusively establishes a defense to the plaintiff's cause of action. See Prudential Ins. Co. of Am.
v. Financial Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). We examine the evidence in the
light most favorable to the party suffering the adverse judgment, see Crane Carrier Co., 140 S.W.3d
at 684, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence
unless reasonable jurors could not. See City of Keller v. Wilson, 168 S.W.3d 802, 823-27 (Tex.
2005). We give the losing party the benefit of all reasonable inferences created by the evidence. See
Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994) (citing White v. Southwestern Bell
Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983)). If there is any conflicting evidence of probative value
on any theory of recovery, an instructed verdict is improper and the case must be reversed and
remanded for jury determination of that issue. Szczepanik, 883 S.W.2d at 649; White, 651 S.W.2d
at 262. Furthermore, even if the reason given by the trial court is erroneous, the granting of a
directed verdict can be affirmed if another ground exists to support it. Democracy Coalition, 141
S.W.3d at 288-89.


 Claims regarding the violation of section 11.086 and nuisance per se


 First, in appellants' eleventh, twelfth, and sixteenth issues, they specifically challenge
the trial court's resolution of their claim under the water code. Appellants' causes of action for
nuisance and nuisance per se arise from the same facts as their claim that the State violated section
11.086. See Tex. Water Code Ann. § 11.086. In their Second Amended Objections, appellants
claimed that the State unlawfully


concentrated the flow of surface water runoff north and east of [the] property and
diverted such flow to a point at the northeast end of [the] property. By constructing
diverting structures without retention capacity, enlarging the drainage capacity of its
culvert system, and lowering the grade of the drainage structures, the IH 35 and
Slaughter Lane underpass, and the land taken from [appellants], [the State] increased
the volume, magnitude, and rate of storm water runoff, and diverted onto
[appellants'] property water which would not have reached such property but for its
diversion by [the State's] alteration of the natural drainage in the area.



Section 11.086, entitled "Overflow Caused by Diversion of Water," provides, in relevant part, that 

(a) No person may divert or impound the natural flow of surface waters in this state,
or permit a diversion or impounding by him to continue, in a manner that
damages the property of another by the overflow of the water diverted or
impounded.


 . . . .


(c) The prohibition of Subsection (a) of this section does not in any way affect the
construction and maintenance of levees and other improvements to control
floods, overflows, and freshets in rivers, creeks, and streams or the construction
of canals for conveying water for irrigation or other purposes authorized by this
code.


Id. A cause of action under section 11.086(a) requires proof of (1) a diversion or impoundment of
surface water that (2) causes (3) damage to the property of the landowner. Kraft v. Langford, 565
S.W.2d 223, 229 (Tex. 1978). "Surface water" has been judicially defined as "that which is defused
over the ground from falling rains or melting snows, and continues to be such until it reaches some
bed or channel in which water is accustomed to flow." Dalon v. DeSoto, 852 S.W.2d 530, 538-39
(Tex. App.--Dallas 1992, writ denied) (citing City of Princeton v. Abbott, 792 S.W.2d 161, 163
(Tex. App.--Dallas 1990, writ denied) (quoting Stoner v. City of Dallas, 392 S.W.2d 910, 912 (Tex.
Civ. App.--Dallas 1965, writ ref'd n.r.e.))); see Dietrich v. Goodman, 123 S.W.3d 413, 418 (Tex.
App.--Houston [14th Dist.] 2003, no pet.) (defining surface water as "water or natural precipitation
diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches
a bed or channels in which it is accustomed to flow"); Raburn v. KJI Bluechip Invs., 50 S.W.3d 699,
704 (Tex. App.--Fort Worth 2001, no pet.); see also Mitchell v. Blomdahl, 730 S.W.2d 791, 792-93
(Tex. App.--Austin 1987, writ ref'd n.r.e.). Surface waters do not follow a defined course or
channel and do not gather into or form a natural body of water. Dalon, 852 S.W.2d at 538-39. 
When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered
surface water. Id. at 538. The chief characteristic of surface water is its inability to maintain its
identity and existence as a body of water, distinguishing it from water flowing in a natural
watercourse. Id. "If the floodwater forms a continuous body with the water flowing in the ordinary
channel, or if it temporarily overflows presently to return, as by recession of the waters, it is to be
regarded as still a part of the stream." Id. at 538-39. Moreover, the prohibition against diverting or
impounding surface waters "does not in any way affect the construction and maintenance of . . .
improvements to control floods . . . ." Tex. Water Code Ann. § 11.086.

 The judgment does not specify the basis for the court's decision. However, at trial,
the parties disputed whether "surface waters" had been diverted, and if they had, whether subsection
(c) of section 11.086 applied to bar appellants' cause of action. In their brief, appellants assume that
the State has actually diverted surface waters and limit their argument to the question of whether the
court properly held that subsection (c) of section 11.086 "trumps" subsection (a). Specifically,
appellants contend that there is no evidence that the improvements were made for the purpose of
controlling floods. Instead, they argue that the evidence shows that the improvements were part of
highway modifications.

 First, we consider the threshold issue of whether there is evidence that "surface water"
was diverted. David Bolton, a certified real estate appraiser, testified that there was a creek on
appellants' property that held water when it rained, but was normally a dry creek. He opined that
the water in the creek came from both direct rainwater and from rainwater running across the
highway. Mark Taylor, a civil engineer, testified that, after the improvements were made,

A: the Reader's Digest version is that we shortened the time of concentration,
which increased the discharge. It's not more physical volume of water. It just
got there faster because the structure more efficiently moved the water, and that
gives you a higher crest. And we calculated that to be--by comparison, the
before discharge was 1,048, and, after, we calculated 1,521 [cubic feet per
second].


Q: But is there anything about the creation of the structures or the new creation, the
improvements done in '88 or '90, that causes more water to go onto the Hopkins
property?


A: No. Water is not created. In a rainfall event, it's the same total volume of
rainfall that hits within the 200 acres. How it conveys from within the
watershed to the point that's under study will vary, depending on the time of
concentration.


 . . .


Q: Would you describe the physical characteristics of the easement taken, the 0.242
acres easement?


A: It's just a channel, a ditch.


Q: And then the area downstream from it, if you would, describe it as well.


A: It's all--it's a channel that's fairly defined for the first eight feet or so of depth.


Q: Are there any permanent type structures on that easement? I'm talking about
newly constructed box culverts on the northbound frontage road [of the Hopkins
property].


A: No, nothing permanent in there. That easement was for shaping and draining the
new elevations of the ground at the box culvert grade into the existing channel.


Q: So what was the use of the ditch before the project to catch and reshape or to
reshape that 0.242 acres, and what's the use after?


A: Both the same. It's just a drainageway.



A.J. Ghaddar, a registered professional civil engineer, testified that


A: the easement was taken to introduce another use of the drainage structure, and
we are achieving that use. We are using now a lot bigger, larger. [sic] And that
easement is very much attached to the structure, the new structure, the
improvement. With that, we brought more flow onto the property, and that more
flow has some impact on the property.


Q: Okay. And you just said the more flow has an impact on the property. What are
those impacts?


A: The impact is that you're going to lose more land for the flow. . . . When you
have more flow in that channel, it's going to rise, the depth of that water. The
depth is going to expand and is going to take more land. The other issue will be
the environmental issue, erosion. Once you get more water flowing through that
channel, you're going to have also more velocity, faster velocity. The depth of
the water, once it increases the velocity--the mean velocity will increase, and
consequently it's going to erode more material and dirt out of the channel. So
it has the impact of land space or area, and then erosion to the channel and the
channel banks.



On cross-examination, Ghaddar was asked whether appellants' property currently had a river that
carried water. He responded that there was not, but that "It's--the channel, the way it is now with
the season, or whenever it rains and runoff from the adjacent property drains into it and carries it
down to Onion Creek, so it's really a subsidiary of Onion Creek, but it's not a continuous flowing
stream." Ghaddar also admitted that when it rained there is an existing body of water that's going
under and onto appellants' property.

 When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer
considered surface water. Dalon, 852 S.W.2d at 538-39. The chief characteristic of surface water
is its inability to maintain its identity and existence as a body of water, distinguishing it from water
flowing in a natural watercourse. Id. "If the floodwater forms a continuous body with the water
flowing in the ordinary channel, or if it temporarily overflows presently to return, as by recession of
the waters, it is to be regarded as still a part of the stream." Id. at 538-39. In this case, the evidence
shows that a ditch was on appellants' property, and although it was often dry, the actual volume of
water was not increased by the State's improvements to IH-35. The expert testimony establishes that
surface water was not involved because the potential floodwater flowing onto the property was able
to maintain its identity and existence as a body of water on the property, see id., and in any event,
when it rains, the same total volume of rainfall hits within the 200 acres. We hold that the trial court
did not err by granting a directed verdict as to section 11.086 of the water code and cause of action
for nuisance per se because the evidence did not establish that "surface water" was diverted onto
appellants' property.

 Furthermore, even if "surface waters" were diverted, there was evidence that the
improvements were constructed in order to control floods and overflows. See Tex. Water Code Ann.
§ 11.086(c). Thus, the prohibition of subsection (a) does not apply. See id. Appellants argue that
there was no evidence that the sole purpose of modifying IH-35 was in order to control floods, and
therefore, subsection (c) does not apply under these circumstances. We disagree. There was expert
testimony that some of the modifications/improvements to IH-35 were made in order to facilitate the
flow of rainwater off the highway. The plain language of the statute does not require the underlying
roadway construction in this case to have the sole purpose of controlling floods, but that the
construction and maintenance of improvements was made in order to control floods and overflows.
See id. Thus, evidence that the improvements in the drainage waterway and modifications to box
culverts were intended to control floods and overflow is sufficient to invoke subsection (c)--barring
liability under subsection (a) of section 11.086 in the event surface waters were diverted. See id. 
We overrule appellants' eleventh, twelfth, and sixteenth issues.


 Nuisance claims


 Next, in appellants' seventeenth issue, they contend that the trial court erred by
granting a directed verdict on their nuisance claim, and by failing to recite in the judgment that they
are not precluded from pursuing the claim in the future. They state that their nuisance claim is based
on the same facts as their claim alleging violation of section 11.086--the State's diversion of surface
waters "and the unleashing of those waters" onto their property, which interfered with their use and
enjoyment of the property. (12)

 A person whose property is injured by an overflow of water caused by an unlawful
diversion or impounding has remedies at law and in equity and may recover damages occasioned by
the overflow. Id. § 11.086(b) (emphasis added). Because we have found that the State's
improvements did not constitute an unlawful diversion or impounding of surface water, we hold that
the trial court did not err by granting a directed verdict in favor of the State on appellants' nuisance
claim. We overrule appellants' seventeenth issue.


Res judicata and collateral estoppel


 Moreover, in their thirteenth, fourteenth, and fifteenth issues, appellants essentially
argue that the judgment should address whether the doctrines of res judicata and collateral estoppel
apply to bar their recovery in other lawsuits that are currently pending.

 The doctrines of res judicata and collateral estoppel both serve the dual purpose of
protecting litigants from the burden of relitigating an identical issue with the same party or his privy
and of promoting judicial economy by preventing needless litigation. John G. and Marie Stella
Kenedy Mem'l Found. v. Dewhurst, 90 S.W.3d 268, 288-89 (Tex. 2002). A judgment is not required
to state whether appellants are precluded from pursuing these claims in the future or whether the
principles of res judicata or collateral estoppel might apply to bar them. See Stewart, 870 S.W.2d
at 20 (judgment must be sufficiently definite and certain to define and protect rights of all litigants,
or provide definite means of ascertaining such rights, so that ministerial officers can carry judgment
into execution without ascertainment of facts not therein stated). It would be improper for the
judgment in this case to include a finding that claims in other litigation are barred by res judicata and
collateral estoppel because such finding would be dependent upon the substance of those claims in
the other suits, the records of which are not addressed in the record before us. See id.; Dewhurst, 90
S.W.3d at 288-89. We overrule appellants' thirteenth, fourteenth, and fifteenth issues.


Motion to disqualify


 Jean Hopkins and the State filed a motion in this Court to disqualify Mark Hopkins,
a son of Jean and James, as appellants' attorney in this case. They allege that Mark has violated
multiple disciplinary rules, which has resulted in actual prejudice to them because the case has been
pending in the court system since 1991 without a final resolution or settlement. We abated the
determination of the motion and this case, stating that until the question of Jean's interest in this
cause was resolved in related divorce litigation, see Hopkins v. Hopkins, 03-03-00629-CV, we would
consider Jean and the State to have aligned interests. In the above cause, we determined that Jean
has assigned her interest in this case to James. Therefore James properly appears in this cause
representing her interest. (13) However, because the State joined Jean's motion, we will discuss the
merits of the motion.

 "Disqualification is a severe remedy" that can cause immediate and palpable harm
by depriving the party of its chosen counsel and disrupting court proceedings. In re Cerberus
Capital Mgmt., L.P., 164 S.W.3d 379, 382 (Tex. 2005) (citing In re Nitla S.A. de C.V., 92 S.W.3d
419, 422 (Tex. 2002) and quoting Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656 (Tex.
1990)). In considering a motion to disqualify, the court must strictly adhere to an exacting standard
to discourage a party from using the motion as a dilatory trial tactic. In re Cerberus Capital Mgmt.,
164 S.W.3d at 382 (citing Spears, 797 S.W.2d at 656). Disciplinary rules are merely
guidelines--not controlling standards--for disqualification motions. In re Meador, 968 S.W.2d 346, 


350 (Tex. 1998). Even if a lawyer violates a disciplinary rule, the party requesting disqualification
must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires
disqualification. See In re Nitla S.A. de C.V., 92 S.W.3d at 422 (citing In re Users Sys. Servs., Inc.,
22 S.W.3d 331, 336 (Tex. 1999)); Meador, 968 S.W.2d at 350; Ayres v. Canales, 790 S.W.2d 554,
558 (Tex. 1990).

 The State contends that it has suffered actual prejudice because it has been "prevented
from settling these issues that have gone on for over a dozen years" and that the continuation of the
case has been due to misrepresentations by Mark Hopkins. Even assuming that Mark has violated
rules of ethics--an assumption on which we do not opine--the State's bare allegations that he has
been the cause of the delay presented in this case and that he has made misrepresentations is not
supported by evidence in the record before us. Therefore, we decline to grant the severe remedy of
disqualification. We deny the motion to disqualify.


CONCLUSION


 We affirm the trial court's directed verdict on appellants' claims of nuisance, nuisance
per se, and violations of the water code. We have sustained appellants' first and second issues,
sustained their third issue in part, overruled the remainder of their issues, and denied the motion to
disqualify.

 Upon remand, the trial court should (1) determine the proper amount of prejudgment
interest to be awarded to appellants on $177,961, at a rate of 10% simple interest, for the time period
of August 21, 1991, until May 12, 2003; (2) award costs to appellants; and (3) determine the proper
amount of postjudgment interest to be awarded to appellants on $177,961, at a rate of 10% simple
interest, for the time period of May 12, 2003, until August 4, 2003. (14)



__________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Remanded in Part

Filed: April 27, 2006
1. The easement is on the same property along the frontage road of IH-35 that was at issue
in Hopkins v. Hopkins, 03-03-00629-CV.
2. Although the case had been set for trial on at least three different dates, continuances were
granted for various reasons.
3. The tender was by check in the amount of $206,189.50 in addition to $52,229.04 that was
already in the registry of the court because the original deposit of $35,462 had already accrued
$16,767.04 in interest.
4. The postjudgment interest rate at the time of judgment was:


(1) the auction rate quoted on a discount basis for 52-week treasury bills issued
by the United States government as most recently published by the Federal
Reserve Board before the date of the computation;


(2) 10 percent if the auction rate described by Subdivision (1) is less than 10
percent; or


(3) 20 percent if the auction rate described by Subdivision (1) is less than 20
percent.


Tex. Fin. Code Ann. § 304.003(c) (West 1998). Section 304.003 was amended in 2003 and 2005. 
We will cite to the 1998 version because the notes to the 2003 legislation provide that the changes
in law only apply in cases in which a final judgment was signed or subject to appeal on or after the
effective date of the Act. The final judgment in this case was signed May 12, 2003, but the Act was
not effective until June.
5. In May 2000, the parties signed a handwritten agreement stipulating that "The State of
Texas, condemnor, has met all legal requirements to take the property interests made the basis of this
suit as described in Condemnor's Statement in Condemnation, subject only to the payment of
compensation as required under the applicable provisions of the Property Code." See Tex. R. Civ.
P. 11.
6. Furthermore, we note that at the jury charge conference, appellants' attorney mentioned that
the State's requested charge stated that "the day of taking in this case" was August 22, while
appellants' requested charge recited the date as August 21. Appellants' attorney stated that "I think
the evidence reflects those two dates. There's not a dime's worth of difference as far as I'm
concerned." The court stated it would phrase the date as "on or about August 21" but the charge
questions state that the easement was taken on August 21, 1991.
7. The offer states that the figure had "been rounded up from" $35,462.
8. The State also asserts that it should not be required to pay costs because appellants did not
introduce evidence of the amount of costs. However, costs are taxed by the clerk of the court. See,
e.g., Tex. R. Civ. P. 162, 622.
9. Section 304.002 generally applies to judgments based on contracts that provide for interest
or time price differential. See Tex. Fin. Code Ann. § 304.002 (West Supp. 2005).
10. Although section 304.003 was amended in 2003 and 2005, we will cite to the 1998 version
because the notes to the 2003 legislation provide that the changes in law only apply in cases in which
a final judgment was signed or subject to appeal on or after the effective date of the Act. The final
judgment in this case was signed on May 12, 2003, shortly before the effective date of June 20, 2003.
11. Appellants withdrew their claims for mental anguish and exemplary damages at the end
of their case before the court addressed the State's motion for directed verdict.
12. The State does not respond to the nuisance claim in its brief.
13. Furthermore, Jean has the right to discharge Mark at any time. See In re Users Sys. Servs.,
Inc., 22 S.W.3d 331, 335 (Tex. 1999) (client can discharge attorney at any time, with or without
cause). Under these circumstances, Jean has failed to prove that Mark's representation has caused
her actual prejudice. See In re Nitla S.A. de C.V., 92 S.W.3d 419, 422 (Tex. 2002). Her attachment
of a "Revocation of Power of Attorney and Assignment of Interest in Causes of Action," drafted in
the form of an affidavit, does not advance her contentions. First, the document summarily 
concludes that despite the existence of a mediated settlement agreement [MSA] and partition and
exchange agreement [PEA], James Hopkins "has no authority or right to act for me in any respect"
and that she intended to "further revoke and rescind any Assignment of Interest in the causes of
action described herein." See Tex. Fam. Code Ann. §§ 4.102, 6.602 (West Supp. 2005). However,
as discussed in Hopkins v. Hopkins, 03-03-00629-CV, the MSA and PEA were wholly binding and
the parties agreed that the MSA, in which Jean sold her interest in this lawsuit to James, was
irrevocable. See id. Furthermore, because the motion to disqualify was not filed in the trial court,
there is no evidence in the record regarding Jean's allegations against Mark.
14. The notice of appeal identifies James Hopkins and Jean Hopkins as appellants in this case. 
In referring to appellants, we recognize that Jean Hopkins has assigned her interest in this lawsuit
to James.